No. 93-457

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

HALL & HALL, INC. a,
Montana Corporation,

    Plaintiff and Appellant,

    -v-

HENRY B. HYDE and FRANCIS B.
BESSENYEY, as co-executors of
the Estate of Margit S. Bessenyey
and the ESTATE OF MARGIT S.
BESSENYEY,

    Defendants and Respondents.

APPEAL FROM:  District Court of the Twenty-First Judicial District,
           In and for the County of Ravalli,
           The Honorable Jeffrey H. Langton, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

               Rodney T. Hartman, Herndon, Hartman, Sweeney &
               Halverson, Billings, Montana

        For Respondent:

               Patrick G. Frank and W. Carl Mendenhall, Worden,
               Thane & Haines, Missoula, Montana

FILED

MAR 22 1994

Filed: *Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:  January 7, 1994

Decided:  March 22, 1994

_____
Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

This is an appeal by Hall & Hall, Inc. (Hall & Hall) from an order of the District Court of the Twenty-First Judicial District, Ravalli County, which granted summary judgment to defendants. We affirm.

The issue presented for our review is whether the District Court properly granted defendants' motion for summary judgment.

The facts underlying this action are as follows: Margit S. Bessenyey died in 1984, leaving a considerable estate, part of which included property in Ravalli County, Montana. The Ravalli County property included one piece of property known as the "Bitter Root Stock Farm" (Stock Farm) constituting approximately 19,097 acres and another piece of property known as the "Brick Barn," a smaller parcel. This action concerns the real estate commission paid to Hall & Hall following the sale of the Stock Farm to Harold Mildenberger and his son Bradley Mildenberger.

Francis B. Bessenyey (Bessenyey) was Margit S. Bessenyey's stepson and is co-executor of her estate along with Henry B. Hyde, a New York attorney. Bessenyey was also a neighbor and long-time friend of Harold Mildenberger. Harold Mildenberger stated in his affidavit that in late 1984, after the death of Margit Bessenyey, he discussed purchasing some or all of her estate's property in Ravalli County. He again approached Bessenyey in early 1985 and yet another time in August of 1986 about purchasing property of the Margit S. Bessenyey estate (the Estate). Each time, Bessenyey responded that the Estate was not in a position to consider a sale

2

at that time.

The affidavits of Francis Bessenyey and Harold Mildenberger state that they were friends and neighbors for many years. Harold Mildenberger purchased the land his home is built on from Margit S. Bessenyey in 1979. Roy Rose, the manager of the Stock Farm, also testified by deposition that he was aware of an approximate thirty-year friendship between Francis Bessenyey and Harold Mildenberger. Throughout the years, these two friends and other members of their families were involved in various real estate transactions and discussions over other possible sales of real property.

Clearly, the sale of the Stock Farm--the subject of this action--did not occur in isolation and must be viewed in light of this longstanding relationship between the Mildenbergers and the Bessenyeys. As an example, in June and July of 1989, the Estate and the Mildenberger family were involved in a series of transactions whereby the Estate conveyed forty acres in Ravalli County to Mrs. Harold Mildenberger in exchange for an easement granted by Harold Mildenberger to the Estate to run pipe over the Mildenbergers' property to irrigate Estate property.

Bessenyey stated in his affidavit that it became apparent in late 1989 that the Estate would have to sell some or all of its Ravalli County real estate holdings to settle the estate's tax liabilities and to provide for specific bequests to legatees. Both Harold Mildenberger and Bessenyey stated that they also discussed a possible sale of an 80-acre parcel but that they did not reach an agreement in regard to that property.

3

In early March of 1990, Bessenyey met with Harold Mildenberger and advised him of the intended sale of the Stock Farm. Although Mildenberger remained interested in purchasing the property, he indicated that he was not financially able to do so at that time as his money was tied up with a deal he was working on in Russia. Both Bessenyey and Harold Mildenberger stated in their affidavits that they agreed to and in fact did stay in touch with one another concerning the sale of the Stock Farm, which was ultimately sold to Harold and Bradley Mildenberger in 1992.

In April of 1990, after Harold Mildenberger indicated he would not then be able to obtain financing to purchase the property, Hyde and Bessenyey, as co-executors of the estate, entered into an agreement appointing Hall & Hall as the Estate's "exclusive agent" for selling the Stock Farm and the Brick Barn properties. The agreement provided for a four percent commission for a sale to a purchaser procured "by or through" Hall & Hall. However, the listing agreement also provided the following reservation:

> 7. _Owner reserves the right to sell to any purchaser not produced by or through [Hall & Hall]_, it's (sic) agents sub or co-brokers, without being liable for the payment of a commission or fee to [Hall & Hall] except as set forth in this paragraph 7.
>
> (a) _If Owner sells the Property to any of the individuals/entities set forth in Exhibit H_ annexed hereto, pursuant to a contract entered into within six (6) months of the date [Hall & Hall] delivers fifteen brochures to Owner pursuant to paragraph 3, _Owner shall pay to [Hall & Hall] a fee equal to one half of one percent (.5%) of the sales price_.
>
> (b) _If Owner sells the Property to a purchaser (other than one set forth in Schedule H_ pursuant to a contract entered into within the time limit set forth in paragraph 7(a)) not produced by or through [Hall & Hall], _Owner_

4

shall pay to [Hall & Hall] a fee equal to one and one half percent (1.5%) of the sales price less the amount expended by Owner for advertising and brochures pursuant to Paragraph 3.

(c)    The parties acknowledge the possibility of a dispute as to whether or not a purchaser was produced by Owner or by or through [Hall & Hall].  Therefore, the parties will endeavor to keep each other informed as to any communications or negotiations concerning the Property. . . . Further, Owner agrees to keep [Hall & Hall] advised as to any independent (i.e. non-broker) inquiries concerning the property.

(d)    Except for those prospective purchasers set forth in Schedule H, Owner agrees not to actively solicit offers for the Property.

(e)    Owner shall consult with [Hall & Hall] on a regular basis with regard to any negotiations for a sale of the Property to any of those persons set forth in Schedule H or to any purchaser not produced by or through [Hall & Hall].

(f)    It shall be a rebuttable presumption that any prospective purchaser who in the contract of sale, warrants and represents that such purchaser (i) did not contact any broker in connection with the sale of the Property, and (ii) did not learn about the availability of the Property through any promotional efforts of [Hall & Hall] and who indemnifies Owner with respect to any breach of such a representation, is not a purchaser produced by or through [Hall & Hall] and the provisions of this paragraph 7 shall apply with respect to the commission to be paid to [Hall & Hall]. . . . It is understood and agreed that in connection with any sale to the individuals/entities set forth in Exhibit H, such a purchaser will be deemed to be produced by Owner . . . . (Emphasis supplied.)

On October 1, 1992, the date of closing the sale to Harold and Bradley Mildenberger, the Estate paid Hall & Hall $83,705.35.  This amount represented one and one half percent of the sales price less $23,544.65 in advertising expenses previously paid to Hall & Hall by the Estate.   The Estate paid the one and one half percent commission to Hall & Hall based on its position that the buyers

were not "produced by or through" Hall & Hall as required by the contract which would allow them a higher commission.

The Estate contends that the Mildenbergers were neither found by nor introduced to the estate by Hall & Hall and, therefore, Hall & Hall was not the "procuring cause" of the sale. Harold Mildenberger's affidavit states that Francis Bessenyey's original offers to sell estate property came at a time when he was financially unable to purchase the property and that his subsequent purchase of the property came at a time when his financial position had changed. The affidavits of both Mildenbergers state that they are willing to sign a document to comply with Paragraph 7(f) stating they did not learn about the property through any promotional effort of Hall & Hall, did not contact any broker in connection with the sale and that they are willing to indemnify the Estate in the context of that paragraph.

In contrast, Hall & Hall claims to have been the "procuring cause" of the sale and, therefore, that the four percent commission should have been paid to them--a difference of $178,750. According to Hall & Hall, since the affidavits of the parties directly contradict each other, a jury should determine which version of the facts is more credible. Hall & Hall argues that it transformed Harold Mildenberger from a mere friend of Francis Bessenyey into a serious player who eventually bought the property. It further argues that the District Court improperly chose between competing versions of fact.

Under Rule 56(c), M.R.Civ.P., the issues before a district

6

court on a summary judgment motion are (1) whether there is any genuine issue of material fact in the case, and (2) if not, whether the moving party is entitled to judgment as a matter of law. See Cereck v. Albertson's, Inc. (1981), 195 Mont. 409, 411, 637 P.2d 509, 510. The District Court concluded that there were no material factual issues and granted summary judgment to defendants on the basis that Hall & Hall was not the "procuring cause" of the sale.

This Court's standard of review of a summary judgment ruling is the same as that of a district court. We determine whether the record discloses genuine issues of material fact, and, if not, whether the moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P.; Knight v. City of Missoula (1992), 252 Mont. 232, 243, 827 P.2d 1270, 1276-77. Further, a party opposing summary judgment is to be indulged to the extent of all inferences which may reasonably be drawn from the record. Jenkins v. Hillard (1982), 199 Mont. 1, 5, 647 P.2d 354, 356.

Thus, our review must initially determine whether there are any genuine issues of material fact here. Hall & Hall contend that the record, in the form of Roy Rose's deposition testimony, establishes that there was a team effort being exerted by Hall & Hall, the Estate, and Roy Rose to bring about a sale to the Mildenbergers. Hall & Hall further contends that the absence of Mildenberger's name on Exhibit "H" is further proof that Hall & Hall was the "procuring cause" of the sale.

There is no conflict in the record that Roy Rose, as manager of the Stock Farm and himself a real estate agent, worked together

7

with Hall & Hall and the co-executors in an effort to effect a sale to the Mildenbergers. However, the uncontradicted evidence in the affidavits of Harold Mildenberger and Francis Bessenyey indicates that the two long-time friends had discussed a sale of the property years before the Estate entered into the agreement between Hall & Hall. Mildenberger stated that he initially approached Bessenyey as early as 1984 about buying the property from the Estate, but that the Estate was not in a position at that time to sell. Later, when the Estate was in a position to sell the property, Francis Bessenyey first contacted his long-time friend Harold Mildenberger, but Mildenberger could not come up with the necessary financing at that time.

It was only after Bessenyey determined that his friend Harold Mildenberger could not then purchase the property that the Estate decided to list the property with a real estate agent. Exhibit "H," appended to the agreement between the Estate and Hall & Hall, is a short list of potential buyers identified by the Estate. Under the terms of the agreement, if the Estate sold to one of those buyers within six months of the date Hall & Hall delivered a copy of the brochure to the Estate, Hall & Hall would receive only a commission of one half percent. If such a buyer later was procured by the estate, the commission paid to Hall & Hall would still be substantial at one and one half percent. The most likely inference to be made from the failure to list Mildenberger on Exhibit "H" is that the Estate did not believe Mildenberger could come up with the necessary financing within six months. Clearly,

8

Hall & Hall did not bring the parties together, when the historical backdrop of this case is reviewed.

Francis Bessenyey and Harold Mildenberger subsequently negotiated the terms of the sale directly between themselves over a number of weeks in 1992 and Mildenberger sent an offer directly to Bessenyey. These facts are not disputed by Hall & Hall and Hall & Hall has not identified any other material facts which are in dispute. We conclude that Hall & Hall has failed to come forward with any genuine issues of material fact which would preclude summary judgment.

The question then becomes whether Hall & Hall was the "procuring cause" of the sale under Montana law. In its order granting summary judgment to defendants, the District Court stated:

> Both Harold and Bradley Mildenberger have stated in their affidavits that their knowledge of the availability of the Stock Farm for sale did not in any way come from Hall & Hall, any advertising due for the estate by Hall & Hall, any promotional efforts of Hall & Hall, nor from any brochure prepared by Hall & Hall. . . .

In Lane v. Smith (1992), 255 Mont. 218, 841 P.2d 1143, we discussed the "procuring cause" doctrine in the context of an exclusive listing agreement. We pointed out that the doctrine is not confined to non-exclusive listing agreements, but applies in all situations unless the parties agree otherwise in the listing contract. Lane, 841 P.2d at 1147. We stated:

> The procuring cause doctrine permits a broker to show that his or her part of the contract was performed and that the principal reaped a benefit from the efforts. D. Burke, Jr., The Law of Real Estate Brokers, § 3.4 (1992).

Lane, 841 P.2d at 1146-47. The listing contract here does not

9

contain an agreement to preclude application of the doctrine; thus, we must ascertain whether the District Court correctly determined whether Hall & Hall was not a "procuring cause" of the sale of the Stock Farm. Further, as also noted by the District Court, the agreement here was an exclusive agency agreement, not an exclusive right to sell agreement. The Estate reserved certain rights in the agreement as provided in detail above.

One of these rights expressly reserved by the Estate was the right to sell the property directly to a buyer who was "not produced by or through Hall & Hall." In such a case, Hall & Hall would still receive a commission, but the percentage would be one and one half percent of the selling price rather that the four percent of the selling price provided for if Hall & Hall procured the purchaser. The District Court concluded that this language was essentially the same as the procuring cause doctrine, and that under previous Montana cases, Hall & Hall had to establish that it found and introduced the Mildenbergers to the Estate, that the parties were brought together by Hall & Hall and that the sale resulted. See, e.g., Barrett v. Ballard (1980), 191 Mont. 39, 47, 622 P.2d 180, 185; Flinders v. Gilbert (1963), 141 Mont 442, 448, 378 P.2d 385, 388; and Shober v. Blackford (1912), 46 Mont. 194, 208-09, 127 P. 329, 332.

The District Court then concluded that the undisputed facts showed that Hall & Hall was not responsible for finding, introducing or bringing the parties together, and further, that the undisputed facts showed that Hall & Hall's actions were not even a

10

cause of the sale, let alone the procuring cause.

The record supports these conclusions made by the District Court. Harold Mildenberger already knew of the availability of the Stock Farm before Hall & Hall signed the agreement with the Estate. His knowledge arose from his longstanding relationship with Francis Bessenyey and his conversations with him. In order for Hall & Hall to recover the full four percent commission under the procuring cause doctrine, Hall & Hall must have been, at a minimum, responsible for bringing the buyer and seller together. Barrett, 622 P.2d at 186. There is nothing in the record to support even an inkling that the Mildenbergers were produced by or through Hall & Hall.

Nonetheless, Hall & Hall claims to have worked together with Roy Rose in keeping Harold Mildenberger informed of all activity and interest which occurred or was generated during the time the property was listed with it up until the sale. As part of its agreement with the Estate, Hall & Hall was active in advertising and attempting to procure a buyer for the property. Its efforts in keeping Harold Mildenberger's interest peaked in the property do not indicate that it considered itself the procuring cause. Hall & Hall wanted to effect a sale. For a property advertised at over $10 million which eventually sold for $7,150,000, even a sale to Mildenberger generated a considerable commission for the broker here at the one and one half percent rate. As noted by the District Court, "it seems clear that this transaction would have taken place without any of the efforts attributable to Hall &

11

Hall."

Roy Rose had a contract with the Estate to manage the Stock Farm and also initially had a 90-day exclusive listing contract should the Estate wish to sell the property. From his testimony in his deposition, this listing contract could have "muddied the waters" as far as a future sale was concerned. Therefore, as part of the deal arranged with Hall & Hall, Rose negotiated an agreement with Hall & Hall for ten percent of Hall & Hall's commission in exchange for giving up his 90-day listing. The Estate also paid Rose a considerable amount ($500,000) to relinquish Rose's 90-day exclusive listing so that it could enter into the agreement with Hall & Hall.

Rose testified that he was in fact aware of the longstanding relationship between Francis Bessenyey and Harold Mildenberger. Although Roy Rose had numerous contacts with the Mildenbergers while he was the property manager of the Stock Farm, Harold Mildenberger's name was omitted from Exhibit "H" and Hall & Hall occasionally listed Mildenberger on their reports to the Estate, we conclude that these facts are not sufficient to demonstrate that Hall & Hall was the procuring cause of the sale to the Mildenbergers.

In addition to these facts, we note also that there were other interactions which transpired between the Estate and the Mildenbergers during the duration of Hall & Hall's agency agreement. Some of these resulted in real property transactions.

Hall & Hall agents attended an annual party given by Bessenyey

12

in Hamilton for social and business acquaintances shortly after the beginning of their agreement with the Estate. Harold Mildenberger was present at this social gathering. Douglas Hart of Hall & Hall stated in his affidavit that he identified Mildenberger as a potential buyer at that time and that Hall & Hall mailed a copy of their brochure to Mildenberger. This mailing of a copy of the brochure, however, was in connection with a possible listing of Mildenberger's property in eastern Montana. In addition to this contact, another representative of Hall & Hall spoke once with Mildenberger over the telephone; at that time Mildenberger advised him that he was not in a position to purchase the property, just as he had done when first approached by Bessenyey when the Estate decided to sell the property in 1990. We conclude that the direct contacts between Hall & Hall and Harold Mildenberger are inconsequential and irrelevant in this case. We further conclude that Hall & Hall was not the procuring cause of the sale of the Stock Farm to the Mildenbergers.

We hold the District Court properly granted summary judgment to the defendants.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____
John Conway Harrison

13

Justices

March 22, 1994

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Rodney T. Hartman, Esq.
Herndon, Hartman, Sweeney & Halverson, P.C.
P.O. Box 80270
Billings, MT  59108-0270

Patrick G. Frank and W. Carl Mendenhall
Worden, Thane & Haines, P.C.
P.O. Box 4747
Missoula, MT  59806

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy