No. 80-213

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

THE STATE OF MONTANA,

            Plaintiff and Respondent,

    vs.

JAMES CLIFTON JENKINS,

            Defendant and Appellant.

---

Appeal from:  District Court of the Eighth Judicial District,
              In and for the County of Cascade.
              Honorable Joel G. Roth, Judge presiding.

Counsel of Record:

    For Appellant: Marcia Birkenbuel, Great Falls, Montana


    For Respondent: J. Bourdeau, Great Falls, Montana
                    and Mike Greely, Helena, Montana

---

                    Submitted on briefs: February 18,
                                         1981
                         Decided: June 10, 1981

Filed: JUN 10 1981


*Thomas J. Kearney*
                    Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

James Clifton Jenkins was charged in August 1979 with two counts of robbery. He was tried by jury in the District Court of the Eighth Judicial District, Cascade County, the Honorable Joel Roth presiding. Jenkins was found guilty on both counts and sentenced to 20 years on each, the sentences to run consecutively. He appeals from both convictions.

Pam Rains, manager of the Feedlot Restaurant in Great Falls, was alone in the restaurant and taking a break at 4:00 p.m. on August 18, 1979. She noticed a man outside who was looking through the front window of the restaurant. The man entered the restaurant and Rains went behind the counter to take his order. The man said: "Do as I say", and gave her a note which read: "Take all the money from the register and give it to me." The man placed a gun on the counter. Two people entered the restaurant before Rains gave the man any money. The man retrieved his note and left. Rains described him as a light-complected white male, 39 or 40 years old, 6' to 6'2", 150 pounds, clean shaven, with short receding hair of a sandy-grey color, wearing tan pants and an open-collared shirt with horizontal white and green stripes.

A few minutes after the attempted robbery of the Feedlot, a man entered the Mode O'Day store in Great Falls. The store was not open for business, but Mavis Bean, who owned the store, and Teresa Bean, Mrs. Robert Anderson and Roberta King were inside unpacking a clothing shipment. The man, who was armed with a knife and gun, approached Teresa Bean and asked where the till was located. Mavis Bean told him they were not open for business and the man left the store. Mavis Bean described the man as Caucasion, 5'10" to 6'1", 37 to 40 years of age, with light receding hair, and wearing old denim pants and a

striped T-shirt.  Teresa Bean described the man as being 6'
tall, slender, clean shaven, fair-complected, with light brown
hair and a receding hairline and wearing jeans and a white
sweater with short sleeves and aqua stripes.

Great Falls police detectives Dave Warrington and Eugene
Bernardi were involved in the robbery investigation.  On August
20 at 11:30 a.m., they entered the Lobby Bar in Great Falls and
noticed James Clifton Jenkins.  Warrington approached Jenkins
and told him he fit the description of a robbery suspect.
Jenkins had no identification and gave his name as Larry White.
Jenkins was patted down in the waist area and asked if he would
accompany the officers so that a witness could see him.  Jenkins
went with the officers voluntarily.  He was not arrested or
handcuffed.  He was placed in the backseat of an unmarked police
car, a yellow two-door Ford Fairmont.  The three men then drove
to the Mode O'Day store.

Mavis Bean was not at the store.  Warrington telephoned
Pam Rains at her home and requested that they meet at a certain
parking lot so Rains could see Jenkins for identification pur-
poses.  The detectives and Jenkins drove across town to meet
Rains.  The police vehicle arrived at the parking lot first.
When Rains arrived, Warrington got out of the car and went to
Rains' vehicle, which was parked 60 feet away.  Warrington told
Rains he had two men seated in his car and asked her if she
could identify either man as the robber.  Detective Bernardi is
6'1" tall and weighs 200 pounds.  He was sitting in the front
seat.  Jenkins is 5'9" tall and weighs 150 pounds and was in
the backseat of the two-door vehicle.  Rains approached the
police car.  When she was about 25 feet away, she pointed at
Jenkins and said: "That's him."  Warrington asked Rains to
walk closer to the car.  When she was 8-10 feet away, she
stated that she was positive that the man in the backseat was

the robber.

Jenkins was then told he was under arrest for the attempted robbery of the Feedlot. He was transported to the Great Falls Police Department and photographed there. While in custody, Jenkins gave a signed consent to search his apartment. A short-sleeve, open-collared shirt, off-white with aqua-green stripes, was found at the apartment. A photographic array containing Jenkins' photograph was shown to three of the witnesses to the robbery at the Mode O'Day and to the two customers of the Feed-lot. Mavis Bean, Teresa Bean and Mrs. Robert Anderson all identified the photograph of Jenkins as the man who tried to rob the store. The Feedlot customers were unable to make a positive identification. Mavis Bean, Teresa Bean and Pam Rains also iden-tified the shirt seized as the one worn by the man who attempted to rob them. Jenkins was then charged with the attempted robbery of the Mode O'Day.

Jenkins entered pleas of "not guilty" to both counts and moved to suppress identification testimony on the grounds that it was the fruit of an illegal arrest and made pursuant to a suggestive one-man show up. The motion to suppress was denied. Jenkins was tried by jury on November 19-21, 1979. The jury returned verdicts of guilty on both counts. Jenkins was sen-tenced to 20 years imprisonment on each count, the sentences to run consecutively. He was also designated a dangerous of-fender, section 46-18-404, MCA, and a persistent felony offender, section 46-18-501, MCA, and found to be ineligible for parole or participation in the prison furlough program.

Jenkins raises two issues on appeal:

1. Was the identification testimony derived from the trans-portation of Jenkins for the purpose of exhibiting him to a witness suppressible because his Fourth Amendment right to be secure in his person against unreasonable seizures had been vio-lated?

-4-

2. Was the identification at the parking lot, and the subsequent identification at trial, suppressible because Jenkins' Fifth Amendment due process rights had been violated?

Jenkins argues that although he was not formally arrested before Rains identified him, the police conduct was indistinguishable from arrest under the standard of Dunaway v. New York (1979), 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824. This contention is based upon the assertion that his journey with the officers was involuntary because, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. United States v. Mendenhall (1980), 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497. Jenkins further contends that because the police lacked probable cause for the "arrest", the fruits thereof should have been suppressed by the District Court.

Not every confrontation initiated by a police officer must be based on probable cause. Terry v. Ohio (1968), 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868. To justify intrusion upon the constitutional rights of a citizen, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. Detectives Warrington and Bernardi were able to point to specific and articulable facts which reasonably warranted the intrusion that Jenkins now questions. They were assigned to investigate the robberies of the Feedlot and the Mode O'Day. They were familiar with the descriptions of the robber. While in the Lobby Bar, just two days after the robberies, they observed a man who fit the description of the suspect. They approached the man. Warrington told him that there had been two attempted robberies two days before and that it was Warrington's opinion that the

man resembled the person who had committed the crimes. When Warrington asked the man his name, he responded that it was Larry White. The man had no identification. Warrington patted the man in the waist area to determine if he had any weapons.

Under the facts outlined above, the police conduct was reasonable and not violative of Jenkins' Fourth Amendment rights. The police must be allowed to approach and question persons who fairly resemble descriptions of perpetrators of criminal acts. While the pat down of Jenkins was intrusive, it was justified because it was limited to a search for weapons, Jenkins fit the description of the robber, and the robber had been armed with a knife and a gun. Police officers are not required to take unnecessary risks in the performance of their duties. "[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest." Terry, supra, 392 U.S. at 27. The initial encounter between Jenkins and the detectives was lawful.

Whether Jenkins' consent to accompany the detectives was voluntary is to be determined by the totality of the circumstances. Mendenhall, supra, 446 U.S. at 557. The District Judge had the opportunity to observe Warrington, Bernardi and Jenkins at the suppression hearing and evaluate their testimony. Warrington testified that after the pat down, he asked Jenkins if he would "mind going" with the officers. Warrington further testified that Jenkins replied that he did not mind because they had the wrong man. The rest of the detectives' testimony indicated that Jenkins was not handcuffed, further searched, or otherwise coerced until after Rains made her identification.

When Jenkins asked the detectives if he was under arrest, they replied that he was not. Jenkins argues that his placement in the backseat of a two-door police vehicle was a restriction amounting to a seizure. However, the point is whether his presence there was voluntary. The fact that he was there is little or no evidence that he was in any way coerced. Mendenhall, supra, 446 U.S. at 559. We find that the record supports the District Court's conclusion that Jenkins agreed to accompany the officers and had not been "arrested" prior to his formal arrest upon identification by Rains. Jenkins was not illegally seized, and the identification testimony was not suppressible because obtained in violation of his Fourth Amendment rights.

Jenkins' second issue concerns the identification by Rains in the parking lot and the subsequent identification of him at trial. He contends that he was denied due process because the show-up was unnecessarily suggestive and conducive to irreparable misidentification. Stovall v. Denno (1967), 388 U.S. 293, 302, 18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967, 1972. The test we must use in resolving this issue is two-pronged. First, was the identification procedure impermissibly suggestive; and, if so, did it have such a tendency to give rise to a substantial likelihood of irreparable misidentification that to allow the witness to make an in-court identification would violate due process. Neil v. Biggers (1972), 409 U.S. 188, 198, 34 L.Ed.2d 401, 410-11, 93 S.Ct. 375, 381. The procedure used to identify Jenkins was undoubtedly suggestive, and one-on-one confrontations have been widely and properly condemned by the United States Supreme Court. However, under the second prong of the test we employ, we must consider whether the totality of the circumstances gives rise to a substantial likelihood of misidentification. We must weigh the corruptive effect of the

suggestive procedure against factors to be considered in evaluating the likelihood of misidentification. Manson v. Brathwaite (1977), 432 U.S. 98, 53 L.Ed.2d 140, 97 S.Ct. 2243. The factors are: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. Neil v. Biggers, supra, 409 U.S. at 199. Rains had a clear view of Jenkins before he entered the restaurant. She viewed him face-to-face across the counter, in good light, during the robbery attempt. He was the only other person in the restaurant, so her level of attention was high. With the exception of height, her description was accurate. The record reveals that she was quite certain that Jenkins was the man who tried to rob her, and only two days had passed between the crime and the confrontation. We cannot conclude that the identification of Jenkins by Rains was so unreliable as to constitute a violation of due process. Considering the totality of the circumstances, we hold that while the identification procedure was suggestive, it did not create a situation in which there was a substantial likelihood of misidentification.

We affirm.

_____
                    Justice

We concur:

_____
          Chief Justice

_____

_____

_____
          Justices

-8-