No. 01-427

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 67

STATE OF MONTANA,

Plaintiff and Respondent,

v.

TED WILLIAM CLAYTON,

Defendant and Appellant.

APPEAL FROM:   District Court of the Eighteenth Judicial District,
In and For the County of Gallatin,
Honorable Thomas A. Olson, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

Lucas J. Foust, Foust Law Office, Bozeman, Montana

For Respondent:

Honorable Mike McGrath, Attorney General; Mark W. Mattioli,
Assistant Attorney General, Helena, Montana

Marty Lambert, County Attorney; Gary Balaz, Deputy County
Attorney, Bozeman, Montana

Submitted on Briefs:   December 6, 2001

Decided:   April 4, 2002

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

1¶      Ted William Clayton (Clayton) was charged by information with the offenses of (1) Driving under the Influence of Alcohol (DUI) (fourth offense), a felony; (2) Obstructing a Peace Officer or other Public Servant, a misdemeanor; and (3) Driving while License Suspended or Revoked, a misdemeanor.  Clayton filed a motion to suppress all evidence derived from his stop.  The motion was denied and Clayton entered a guilty plea, reserving his right to appeal from the denial of the motion.  We affirm.

2¶      The only issue on appeal is whether the District Court erred in denying Clayton's motion to suppress.

## FACTS AND PROCEDURAL BACKGROUND

3¶      In the early morning hours of August 17, 2000, Officer Ed Benz of the Bozeman Police Department observed Clayton's vehicle leaving the Point After Bar & Grill, turning right onto Rouse Avenue and heading northbound.  Officer Benz was training Officer Martz, who was driving the patrol vehicle.

4¶      Clayton testified that he was driving twenty-five miles per hour, but Officer Benz testified that the vehicle was traveling at thirty miles an hour "or a little better."  The speed limit was twenty-five miles per hour.  Officer Benz also testified that Clayton's vehicle "accelerated hard," after it turned onto Rouse, and "[a]s the vehicle noticed that we were a patrol car, the nose of the vehicle actually started coming down like they were braking.  As it went past, you could see the brake lights were on."  Officer Benz then instructed Officer Martz to turn around and follow the vehicle.

¶5 Clayton then turned onto Lamme Street, pulled to the right side of the road and came to a stop. The patrol car started to pull in behind the vehicle and Officer Benz shined a police spotlight into Clayton's vehicle "to see how many people were in there." Before the patrol car came to a complete stop, Clayton got out of his vehicle, turned and looked right at the patrol car and then ran. Officer Benz immediately recognized Clayton from a prior involvement and knew that Clayton's license had been revoked. Officer Benz then got out of the patrol car, yelled for Clayton to stop and began chasing Clayton. Clayton did not stop but, as he was running, he fell several times. After one such fall, Officer Benz caught up with Clayton and handcuffed him.

¶6 Clayton was subsequently charged and filed a motion to suppress, arguing that his vehicle was illegally stopped. Following an evidentiary hearing, the Eighteenth Judicial District Court, Gallatin County, entered findings of fact and conclusions of law denying the motion to suppress.

¶7 In January 2001, Clayton entered pleas of guilty to the felony DUI and two of the misdemeanor charges, reserving his right to appeal the suppression issue. This appeal followed.

DISCUSSION

¶8 We review a district court's order on a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Roberts*, 1999 MT 59, ¶11, 293 Mont. 476, ¶ 11, 977 P.2d 974, ¶ 11. A trial court's findings are clearly erroneous if not supported by

3

substantial evidence, if the court has misapprehended the effect of the evidence, or if this Court's review of the record leaves us with the firm conviction that a mistake has been made. *Roberts*, ¶11.

9¶ Clayton argues that he was seized when the officers pulled in behind his vehicle and shined a spotlight into his vehicle, and that the seizure violated his Fourth Amendment rights because the officers did not have a particularized suspicion to effect a stop as required by § 46-5-401, MCA. He states in his brief that, "[i]n addition to being unable to physically move his vehicle from the scene, the defendant in the instant case felt restrained because the law enforcement officers were using a spotlight to look into his vehicle." He relies on our decision in *State v. Roberts*, 1999 MT 59, 293 Mont. 476, 977 P.2d 974, for the proposition that he "reasonably believed he was not free to leave," and that the law enforcement officers "precipitated the confrontation."

10¶ The State argues that no seizure occurred until Officer Benz caught up with Clayton. The State relies on the United States Supreme Court decision in *California v. Hodari D.* (1991), 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690, for the proposition that a seizure requires either a physical restraint or submission to an assertion of authority. Alternatively, the State argues that if a stop did occur, Officer Benz had particularized suspicion to effect the stop and that the officers' action was reasonable in nature and scope.

11¶ The Fourth Amendment to the United States Constitution provides that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against

4

unreasonable searches and seizures, shall not be violated." The fundamental purpose of the Fourth Amendment's prohibition against unreasonable searches and seizures is to protect the privacy and security of individuals. *Dorwart v. Caraway*, 1998 MT 191, ¶ 21, 290 Mont. 196, ¶ 21, 966 P.2d 1121, ¶ 21.

12¶ The central inquiry under the Fourth Amendment is the reasonableness under all the circumstances of a particular governmental invasion of a citizen's personal security. *Terry v. Ohio* (1968), 392 U.S. 1, 19, 88 S.Ct. 1868, 1878-79, 20 L.Ed.2d 889, 904. "The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" *United States v. Mendenhall* (1980), 446 U.S. 544, 553-54, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509. Only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred. *Mendenhall*, 446 U.S. at 552, 100 S.Ct. at 1876, 64 L.Ed.2d at 509 (quoting *Terry*, 392 U.S. at 19, 88 S.Ct. at 1879, 20 L.Ed.2d at 904). When deciding whether a person has been seized through a show of authority, the test is an objective one: whether, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509.

13¶ In *Hodari D.*, the United States Supreme Court added a subjective element to the traditionally objective test of whether a seizure has occurred. In *Hodari D.*, police

5

officers were patrolling in a high crime area of Oakland, California. *Hodari D.*, 499 U.S. at 622, 111 S.Ct. at 1549, 113 L.Ed.2d at 695. As the officers' vehicle rounded a corner, a group of youths standing around a car saw them and apparently panicked and took flight. One of the officers left the car and ran after Hodari. When Hodari saw that the officer was chasing him, he tossed away what appeared to be a small rock. The officer then tackled Hodari, handcuffed him and radioed for assistance. The rock that Hodari tossed was found to be crack cocaine. *Hodari D.,* 499 U.S. at 622-23, 111 S.Ct. at 1549, 113 L.Ed.2d at 695.

14¶ The issue before the Court was whether, "at the time he dropped the drugs, Hodari had been 'seized' within the meaning of the Fourth Amendment." *Hodari D.,* 499 U.S. at 623, 111 S.Ct. at 1549, 113 L.Ed.2d at 695. The Court held that Hodari had not been seized and stated that, with respect to a show of authority, a seizure does not occur if the subject does not yield. *Hodari D.*, 499 U.S. at 626, 111 S.Ct. at 1550, 113 L.Ed.2d at 697.

15¶ The Court concluded that this holding was not in conflict with *Mendenhall's* objective test because *Mendenhall*

> establishes a *necessary,* but not a *sufficient*, condition for seizure–or, more precisely, for seizure effected through a "show of authority." *Mendenhall* establishes that the test for existence of a "show of authority" is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person. . . . [A]ssuming that [the officer's] pursuit in the present case constituted a "show of authority" enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled.

*Hodari D.*, 499 U.S. at 628-29, 111 S.Ct. at 1551-52, 113 L.Ed.2d at 698-99.

¶16 The State maintains that *Hodari D.* is applicable to this case. Thus, assuming that the officers' act of pulling in behind Clayton's vehicle and shining a spotlight in the vehicle constituted a show of authority, no seizure occurred until Officer Benz caught up with Clayton because Clayton did not submit to that show of authority and chose instead to run from the scene.

¶17 Incredibly, Clayton does not address *Hodari D.* He insists that this was a traffic stop and therefore is controlled solely by § 46-5-401, MCA, and that the stop was illegal because the State cannot point to objective data from which a particularized suspicion can be based.

¶18 Section 46-5-401, MCA, provides:

> Investigative Stop. In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

¶19 The question of whether particularized suspicion of wrongdoing exists is a factually driven inquiry dependent on the totality of circumstances giving rise to the investigative stop. *Roberts*, ¶ 13. This case presents the unique question of *when* an investigative stop occurred. There is no question that the officers had a particularized suspicion of wrongdoing when Clayton got out of the car and Officer Benz recognized him and knew that his license had recently been revoked. The question is whether the

officers had effected a stop prior to that time and, if so, whether they had a particularized suspicion at that time.

20¶    The District Court found that Clayton's vehicle "stopped without the officers actions" and that the officers stopped behind and to the left of Clayton's car and "scan[ned] the situation with a spotlight to determine the number of passengers and what the driver was up to." From these findings, the court concluded that the officers acted reasonably, that they did not cause the stop and that, when Clayton turned and faced the officers, giving away his identity, the officers had particularized suspicion.

21¶    When analyzing cases to determine if a seizure occurred, we have applied the *Mendenhall* test of whether, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *Roberts*, ¶ 16. *See also State v. Jenkins* (1981), 192 Mont. 539, 543, 629 P.2d 761, 764; *State v. Carlson*, 2000 MT 320, ¶ 20, 302 Mont. 508, ¶ 20, 15 P.3d 893, ¶ 20. No Montana case has discussed *Hodari D.* or determined whether it comports with Montana constitutional requirements. We hold that it does not.

22¶    Several other states have rejected *Hodari D.* and analyzed seizure issues under their own constitutions. *See State v. Young* (Wash. 1998), 957 P.2d 681, 686, n. 6. Although we analyze most search and seizure questions under traditional Fourth Amendment principles enunciated by the federal courts, we will not "march lock-step" with federal courts, where the broader protections of the Montana Constitution may be implicated. *Deserly v. Department of Corrections,* 2000 MT 42, ¶ 18, 298 Mont. 328, ¶

8

18, 995 P.2d 972, ¶ 18; *State v. Guillaume,* 1999 MT 29, ¶ 15, 293 Mont. 224, ¶ 15, 975 P.2d 312, ¶ 15; *State v. Bullock* (1995), 272 Mont. 361, 384, 901 P.2d 61, 75. We conclude that under Article II, Section 11 of the Montana Constitution, the test for whether a seizure occurs is a purely objective one. We re-affirm our holding in *Roberts* that no seizure occurs unless, in view of all the circumstances surrounding the incident, a reasonable person would have felt that he was not free to leave.

23¶ This test is necessarily imprecise and will vary depending on the setting in which the conduct occurs. *Michigan v. Chesternut* (1988), 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565, 572. The test's objective standard allows the police to determine in advance whether the conduct contemplated will implicate Article II, Section 11 of the Montana Constitution and does not shift the focus of the inquiry to a person's subjective reaction to police conduct.

24¶ The seizure question here, then, becomes whether the officers' act of pulling in behind Clayton's vehicle and shining a spotlight into his vehicle constituted such a show of authority that a reasonable person would have believed he or she was not free to leave. That Clayton did in fact leave is irrelevant to this inquiry.

25¶ The District Court found that Clayton stopped his vehicle of his own volition. Clayton argues that, like the defendant in *Roberts*, the officers in this case blocked his vehicle. We have no trouble distinguishing the facts of *Roberts* from the circumstances here. In *Roberts*, the defendant had pulled into his driveway and the officer pulled in behind the defendant's pickup truck, "blocking its exit." *Roberts*, ¶ 7. We noted that

9

the officer "could have merely parked his patrol car on the shoulder in front of 107 Daly Ave.," but instead he chose to pull into the driveway, blocking Roberts' exit and "physically constraining Roberts' means and direction of travel. Furthermore, [the officer] was armed and in uniform, and his show of authority in immediately exiting his patrol car and approaching Roberts added to the official nature of the encounter." *Roberts,* ¶ 16.

26¶ Here, according to a diagram drawn by Clayton at the suppression hearing, the encounter took place on Lamme Street, which, contrary to Clayton's argument, is not a "one-lane driveway." The diagram indicates that there was a car parked in front of Clayton's vehicle and that the police car pulled in behind his vehicle and a little to the left. At the hearing, Clayton testified that the police car "was very close to blocking me in to where I wouldn't have been able to maneuver around." Additionally, Clayton testified that the police car, if not completely stopped, "was very, very, very slow."

27¶ The police officers slowing down and coming to a stop behind Clayton's vehicle and shining a spotlight into his vehicle do not amount to such a show of authority that a reasonable person would have believed he or she was not free to leave. The police officers did not initiate the stop, but only pulled in behind Clayton and shined the spotlight to determine how many people were in the vehicle. The officers did not have their sirens or emergency lights on and the encounter took place on a public street. Additionally, the officers did not exit their vehicle and approach Clayton. Under the facts of this case, we conclude that no stop occurred prior to Clayton exiting his vehicle.

When Clayton left the vehicle and Officer Benz recognized him, the officers had a particularized suspicion to stop Clayton.

28¶     We hold that the District Court correctly denied the motion to suppress.

29¶     Affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY

/S/ PATRICIA COTTER

/S/ TERRY N. TRIEWEILER

/S/ JIM REGNIER

11