Nos. 01-879 and 01-880

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 120

STATE OF MONTANA,

  Plaintiff and Respondent,

v.

JUDD MICHAEL WAGNER,

  Defendant and Appellant.

_____

JUDD M. WAGNER,

  Petitioner and Appellant,

v.

STATE OF MONTANA,

  Respondent and Respondent.

_____

APPEAL FROM:    District Court of the First Judicial District,
                In and for the County of Broadwater, Cause Nos. DV-01-16 and DC-01-26
                The Honorable Jeffrey Sherlock, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Charles E. Petaja, Attorney at Law, Helena, Montana

        For Respondent:

                Hon. Mike McGrath, Attorney General; Jennifer Anders,
                Assistant Attorney General; Ryan M. Archer, Legal Intern, Helena, Montana

                John T. Flynn, Broadwater County Attorney, Townsend, Montana

                                    Submitted on Briefs:  October 10, 2002
                                             Decided:  April 29, 2003

Filed:

            _____
                              Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1 Following an arrest for driving under the influence of alcohol, Appellant Judd Wagner moved the Broadwater County Justice Court to dismiss the charge based on the arresting officer's lack of particularized suspicion to initiate an investigative stop. Wagner asserted that the officer failed to sufficiently corroborate a citizen informant's report. Wagner simultaneously filed a petition for reinstatement of his driver's license with the First Judicial District Court, Broadwater County, under the same theory. The Justice Court denied Wagner's motion and Wagner entered a guilty plea subject to his right to appeal the denial. The District Court denied Wagner's petition for reinstatement and dismissed his subsequent appeal from Justice Court under the theory of res judicata. Wagner filed independent appeals from each proceeding. We have consolidated the cases on appeal and affirm the judgment of the District Court.

¶2 Wagner presents three issues on appeal. We rephrase the sole dispositive issue as whether Officer Janes' encounter with Wagner at the pay phone constituted an investigative stop.

BACKGROUND

¶3 At approximately 11:00 a.m. on June 17, 2001, motorist Darwin Belcourt witnessed a red Ford Probe, bearing Montana license plate number 5A30553, traveling west on Interstate 90, near Belgrade, Montana, drive off of the road in a construction zone, return to the road, and then proceed to travel west in an erratic manner. Belcourt followed the vehicle for approximately twenty miles to a Town Pump at the junction of Interstate 90 and U.S. 287 near Three Forks, Montana. Belcourt noted that a lone male occupant exited the vehicle and

2

staggered into the building. Using a cell phone, Belcourt phoned 911 to report his observations. Belcourt remained at the Town Pump until law enforcement arrived.

¶4 The 911 operator conveyed the report to Montana Highway Patrol Officers Cal Janes, Jim Hunter, and Mike Swingley at approximately 11:18 a.m. Officer Janes arrived at the Town Pump around 11:38 a.m. and Officers Hunter and Swingley arrived shortly thereafter. Upon his arrival, Officer Janes identified an unoccupied vehicle matching the description and license plate number of the vehicle reported by Belcourt. Officer Janes remained outside to establish contact with Belcourt while Officer Hunter and Sergeant Swingley proceeded inside. A short time later, Officer Janes joined Hunter and Swingley.

¶5 Once inside, the officers observed a lone male talking on a pay phone. The officers also noted that the male "continually swayed" as he stood at the phone. The officers initiated contact with the individual, later determined to be Wagner, and immediately discerned an odor of alcohol emanating from Wagner's person. The officers requested that Wagner speak with them outside and Wagner complied. As the parties proceeded to the patrol cars, Officer Janes observed Wagner's staggering gait. Further, Wagner voluntarily apologized to Officer Janes and admitted that he should not have proceeded to drive given his prior consumption of alcohol.

¶6 At the patrol car, Wagner performed poorly on the horizontal gaze nystagmus test, incorrectly recited the alphabet, and admitted several times that he was intoxicated. Officer Janes read Wagner the preliminary breath test implied consent form but Wagner declined to submit a breath sample for analysis. Officer Janes subsequently transported Wagner to the Broadwater County Sheriff's Office where Wagner refused to perform any field sobriety

3

tests or provide a breath sample. Officer Janes seized Wagner's driver's license and cited him for driving under the influence of alcohol, second offense.

¶7 On June 29, 2001, Wagner filed a petition with the District Court challenging the suspension of his driver's license. Wagner contested whether Officer Janes procured the requisite particularized suspicion prior to conducting the alleged investigative stop. More specifically, Wagner argued that Officer Janes did not sufficiently corroborate Belcourt's report of erratic driving. Simultaneously, Wagner moved the Broadwater County Justice Court to dismiss the DUI charge for the same reasons submitted in the reinstatement proceedings, lack of particularized suspicion. On August 28, 2001, the Justice Court denied Wagner's motion. The Justice Court continued the criminal proceedings pending resolution of the reinstatement proceedings.

¶8 On October 9, 2001, the District Court denied Wagner's petition for reinstatement of his driver's license. The District Court concluded that Officer Janes sufficiently corroborated Belcourt's report and, therefore, satisfied the particularized suspicion requirements. On October 19, 2001, Wagner pled guilty to the offense in Justice Court under a reservation of rights. On October 25, 2001, Wagner appealed the Justice Court's denial of his motion to dismiss to the District Court. On November 30, 2001, the District Court rejected Wagner's appeal concluding that "the District Court's Order on Petition for Review dated October 9, 2001, is *res judicata* and dispositive of Defendant's Notice of Appeal to the District Court" in the criminal proceeding.

¶9    Wagner has perfected two separate appeals, one from the reinstatement proceedings and one from the criminal proceedings. As the separate appeals contemplate identical issues, we hereby consolidate the cases on appeal.

## STANDARD OF REVIEW

¶10    We review a district court's denial of a petition for reinstatement of a driver's license to determine whether the court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *Anderson v. State Dept. of Justice* (1996), 275 Mont. 259, 262, 912 P.2d 212, 214. A district court's grant or denial of a motion to dismiss in a criminal case is a question of law which we review *de novo*. *State v. Pratt* (1997), 286 Mont. 156, 169, 951 P.2d 37, 45.

## DISCUSSION

¶11    Did Officer Janes' encounter with Wagner at the pay phone constitute an investigative stop?

¶12    Wagner contends that a reasonable person would not feel free to leave when a police officer approaches the individual at a pay phone and requests that the individual accompany the officer to a patrol car for questioning. Since a reasonable person would not feel free to leave, Wagner insists that the encounter, by definition, constitutes an investigative stop.

¶13    For an officer to effect an investigative stop based on a citizen informant's report: (1) the citizen informant must identify himself or herself to law enforcement, (2) the report must be based upon the informant's personal observations, and (3) the officer must corroborate the informant's information by observing illegal activity or finding the person, the vehicle, and the vehicle's location substantially as described by the informant. *See Pratt*, 286 Mont.

5

at 165, 951 P.2d at 42-43. Wagner concedes that the State established the first two elements of the *Pratt* test. However, Wagner maintains that Officer Janes failed to sufficiently corroborate Belcourt's report. Therefore, according to Wagner, Officer Janes unlawfully initiated an investigative stop precipitating suppression of the inculpatory evidence.

¶14    The State's response is two-fold. First, the State argues that "mere police questioning does not amount to a 'seizure' requiring particularized suspicion." The State submits that the initial encounter, encompassing the outside discussion, did not constitute an investigative stop. The State contends that the investigative stop in this case occurred after Wagner's voluntary confession, a confession which provided the requisite particularized suspicion for the ensuing stop. Alternatively, if we declare that Officer Janes effected an investigative stop upon engaging Wagner at the pay phone, the State contends that Officer Janes obtained the requisite particularized suspicion prior to initiating the stop.

¶15    The State presented its same two-fold analysis to the District Court in the reinstatement proceedings. The District Court entered judgment in favor of the State based on the State's alternative position. However, the District Court's order contains no reference to the State's threshold challenge, i.e., "whether the [initial] encounter [was] merely a 'voluntary encounter' or an 'investigative stop.'"

¶16    Section 46-5-401, MCA, provides:

> **Investigative stop.** In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

6

As the statute indicates, a peace officer must have a particularized suspicion of wrongdoing to conduct an investigative stop. Therefore, if we conclude that the pay phone encounter constituted an investigative stop, we must examine the factors articulated in *Pratt* to ascertain whether Officer Janes obtained the requisite particularized suspicion. If we conclude that the pay phone encounter did not constitute a stop, then we must determine whether Officer Janes obtained the requisite particularized suspicion after initiating contact but prior to conducting a stop. Therefore, the critical inquiry in this case is whether Officer Janes seized or stopped Wagner, and, if so, at what juncture?

¶17    In *United States v. Mendenhall* (1980), 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497, two agents from the Drug Enforcement Administration ("DEA") approached Mendenhall as she disembarked from a plane at the Detroit Metropolitan Airport to investigate a drug trafficking suspicion. The agents identified themselves as federal narcotics agents and requested to see Mendenhall's identification and airline ticket. The agents discovered a discrepancy between the identities contained in the driver's license and airline ticket. The agents returned the information to Mendenhall and asked if she would accompany them to the airport DEA office for further questioning. Mendenhall complied.

¶18    At the office, the agents requested Mendenhall's consent to search her person and handbag. The agents informed her that she had the right to decline the search but Mendenhall acquiesced. Following the consent, a female officer searched Mendenhall's person and discovered heroin. The agents arrested Mendenhall for possession of heroin with the intent to distribute it. Mendenhall moved the trial court to suppress the evidence on the grounds that the agents acquired it through an unconstitutional search and seizure. The trial

7

court denied Mendenhall's motion and a jury subsequently convicted her of the offense. The Sixth Circuit Court of Appeals reversed the conviction and the United States Supreme Court granted certiorari to consider whether the agents violated Mendenhall's Fourth Amendment rights.

¶19 The Supreme Court first analyzed the threshold "seizure" question, similar to the one presented *sub judice*. The Supreme Court noted, "if the respondent was 'seized' when the DEA agents approached her on the concourse and asked questions of her, the agents' conduct in doing so was constitutional only if they reasonably suspected the respondent of wrongdoing." *Mendenhall*, 446 U.S. at 551-52, 100 S.Ct. at 1875-76. The Supreme Court next observed that "not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Mendenhall*, 446 U.S. at 552, 100 S.Ct. at 1876. Additionally, the Supreme Court stated "[a]s long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877.

¶20 Based on the foregoing, the Supreme Court concluded that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. The Court determined that no "seizure" of Mendenhall occurred. The Court found the following facts determinative: the

events took place in a public concourse, the agents wore no uniforms and displayed no weapons, the agents did not summon Mendenhall to their presence, the agents requested rather than demanded to see Mendenhall's identification, the agents requested rather than demanded that Mendenhall accompany them to the office, and the agents did not utilize threats or any show of force to compel Mendenhall's compliance.

¶21     Based on the above facts, the Supreme Court concluded that "nothing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way, and for that reason we conclude that the agents' initial approach to her was not a seizure." *Mendenhall*, 446 U.S. at 555, 100 S.Ct. at 1878. Following this initial approach, the agents obtained the inculpatory evidence through consensual means. Accordingly, the Supreme Court reversed the Sixth Circuit Court of Appeals. *Mendenhall*, 446 U.S. at 560, 100 S.Ct. at 1880.

¶22     This Court first referenced *Mendenhall* in *State v. Jenkins* (1981), 192 Mont. 539, 629 P.2d 761. In *Jenkins*, two officers approached Jenkins in a bar and told him that he fit the description of a robbery suspect. After patting him down, the officers asked if Jenkins would accompany them to a meeting with one of the witnesses to the robbery. Jenkins voluntarily traveled with the officers to the rendevous point in an unmarked police car. At that point, Jenkins was not restrained or placed under arrest. At the meeting, the witness identified Jenkins as the perpetrator and the officers arrested him for attempted robbery.

¶23     Jenkins pled not guilty to the offense and moved to suppress the identification. Jenkins argued, in part, that "his journey with the officers was involuntary because, in view of all the circumstances surrounding the incident, a reasonable person would have believed

9

that he was not free to leave." *Jenkins*, 192 Mont. at 543, 629 P.2d at 764. The district court denied Jenkins' motion and a jury subsequently convicted him of attempted robbery. Jenkins appealed the denial and conviction to this Court.

¶24 This Court concluded that police officers "must be allowed to approach and question persons who fairly resemble descriptions of perpetrators of criminal acts." *Jenkins*, 192 Mont. at 544, 629 P.2d at 764. Therefore, based on the facts presented, we held the initial encounter to be lawful. As for the officers' subsequent request that Jenkins accompany them to the meeting, we concluded:

> [Officer] Warrington testified that after the pat down, he asked Jenkins if he would "mind going" with the officers. Warrington further testified that Jenkins replied that he did not mind because they had the wrong man. The rest of the detectives' testimony indicated that Jenkins was not handcuffed, further searched, or otherwise coerced until after Rains made her identification. When Jenkins asked the detectives if he was under arrest, they replied that he was not. Jenkins argues that his placement in the backseat of a two-door police vehicle was a restriction amounting to a seizure. However, the point is whether his presence there was voluntary. The fact that he was there is little or no evidence that he was in any way coerced. We find that the record supports the District Court's conclusion that Jenkins agreed to accompany the officers and had not been "arrested" prior to his formal arrest upon identification by Rains. Jenkins was not illegally seized, and the identification testimony was not suppressible because obtained in violation of his Fourth Amendment rights.

*Jenkins*, 192 Mont. at 544-45, 629 P.2d at 764 (citation omitted).

¶25 Several years later, we again referenced *Mendenhall* in *State v. Clayton*, 2002 MT 67, 309 Mont. 215, 45 P.3d 30. In *Clayton*, officers observed a vehicle leaving a bar in the early morning hours and decided to follow it. Shortly thereafter, the vehicle turned onto a side street, pulled to the right side of the road, and came to a complete stop. The officers pulled in behind the vehicle and shined a spotlight into it to ascertain the number of occupants in

10

the vehicle. The driver immediately exited the vehicle and fled. Officers ultimately apprehended the driver, Clayton, and charged him with driving under the influence of alcohol, fourth offense, obstructing a peace officer, and driving with a suspended or revoked license. Clayton moved to suppress the inculpatory evidence acquired subsequent to the allegedly illegal stop. The district court denied Clayton's motion and Clayton pled guilty to the offenses subject to his right to appeal the denial.

¶26 On appeal, Clayton argued that the officers "seized" him when they pulled in behind his vehicle and shined a light into the interior. Clayton contended that the seizure was unlawful as the officers did not have a particularized suspicion of wrongdoing to conduct the stop.

¶27 We observed that "[t]his case presents the unique question of *when* an investigative stop occurred. . . . The question is whether the officers had effected a stop prior to . . . [when Clayton fled] and, if so, whether they had a particularized suspicion at that time." *Clayton*, ¶ 19. We then noted this Court's adoption and application of the *Mendenhall* test. *See Jenkins*, 192 Mont. at 543, 629 P.2d at 764; *State v. Roberts*, 1999 MT 59, ¶ 16, 293 Mont. 476, ¶ 16, 977 P.2d 974, ¶ 16; *State v. Carlson*, 2000 MT 320, ¶ 20, 302 Mont. 508, ¶ 20, 15 P.3d 893, ¶ 20. We stated that the "test is necessarily imprecise and will vary depending on the setting in which the conduct occurs." *Clayton*, ¶ 23. Nevertheless, we reaffirmed the prior rulings that "no seizure occurs unless, in view of all the circumstances surrounding the incident, a reasonable person would have felt that he was not free to leave." *Clayton*, ¶ 22.

11

¶28    Based on the circumstances presented, we concluded that no stop occurred prior to Clayton exiting his vehicle. *Clayton*, ¶ 27. We arrived at this conclusion based on the following facts:

> The police officers slowing down and coming to a stop behind Clayton's vehicle and shining a spotlight into his vehicle do not amount to such a show of authority that a reasonable person would have believed he or she was not free to leave. The police officers did not initiate the stop, but only pulled in behind Clayton and shined the spotlight to determine how many people were in the vehicle. The officers did not have their sirens or emergency lights on and the encounter took place on a public street. Additionally, the officers did not exit their vehicle and approach Clayton.

*Clayton*, ¶ 27.

¶29    On appeal, Wagner attempts to distinguish the above cases and analogize the facts at bar to those present in *Roberts*. In *Roberts*, following a citizen report regarding a potential drunk driver, a police officer identified and trailed the subject vehicle. The officer observed no erratic driving or traffic law infractions. The officer followed the vehicle to the driver's home and pulled in behind the vehicle on the home's single-lane driveway. The officer immediately engaged the driver and, following an investigation, arrested the driver for driving under the influence of alcohol.

¶30    Analogizing the facts presented in *Roberts* to *United States v. Kerr* (9th Cir. 1987), 817 F.2d 1384, we stated:

> In this case, as in *Kerr*, while Officer Oster could have merely parked his patrol car on the shoulder in front of 107 Daly Ave., he chose to instead pull into the one-lane driveway and block Roberts' exit, thereby physically constraining Roberts' means and direction of travel. Furthermore, Officer Oster was armed and in uniform, and his show of authority in immediately exiting his patrol car and approaching Roberts added to the official nature of the encounter.

12

*Roberts*, ¶ 16. We held that when the officer pulled into the single-lane driveway, blocking Roberts' exit, "he precipitated an investigative stop–amounting to a Fourth Amendment 'seizure' of the person–during which a reasonable person would not have felt free to simply leave." *Roberts*, ¶ 16.

¶31    As Wagner was not subjected to the constraints present in *Roberts*, we believe that the facts at bar are more analogous to *Mendenhall*, *Jenkins*, and *Clayton*. Here, the officers did not initiate a stop of Wagner's vehicle. Instead, Wagner exited the Interstate, parked at the Town Pump, and entered the building on his own volition. As in *Mendenhall*, Officer Janes did not summon Wagner to his presence–the encounter took place at a public venue of the defendant's choosing. Officer Janes subsequently requested that Wagner accompany him outside for further questioning. The evidence in the record does not indicate that Officer Janes compelled compliance with the request through demand, coercion, threat, or show of force. In short, there is no evidence in the record which indicates that the officers restrained Wagner's liberty, by means of physical force or show of authority. To the contrary, the evidence suggests that Wagner was free to disregard Officer Janes' request and walk away at any time during the initial encounter. In view of all of the circumstances surrounding the incident, we hold that the officers' initial actions did not amount to such a show of authority that a reasonable person would have believed he or she was not free to leave. Therefore, the encounter at the pay phone did not constitute an investigative stop.

¶32    Following the initial encounter, Officer Janes' personal observations, coupled with Wagner's admissions, provided the requisite particularized suspicion to conduct the ensuing investigative stop. As indicated above, the District Court did not address the threshold

13

"seizure" issue. The District Court analyzed the issues presented pursuant to *Pratt*. Nevertheless, we have on several occasions reiterated that we will affirm a district court's decision when it reaches the correct result for the wrong reasons. *See State v. Francis*, 2001 MT 233, ¶ 16, 307 Mont. 12, ¶ 16, 36 P.3d 390, ¶ 16. Based on our answer to the threshold "seizure" question, we need not consider the issues presented by the parties with respect to *Pratt*.

¶33 Affirmed.

/S/ JIM REGNIER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART

Justice Terry N. Trieweiler specially concurring.

¶34    I concur with the result of the majority Opinion. However, I would arrive at that result for different reasons.

¶35    I agree that the correct test for whether a person has been "seized" within the meaning of the Fourth Amendment or Montana's independent right to be free from unreasonable searches and seizures found at Article II, Section 11 of the Montana Constitution depends on whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. However, I disagree with the majority's conclusion that no seizure occurred in this case when two armed and uniformed law enforcement officers approached the Defendant in a convenience store while he was talking on the phone and, after determining his identity, asked that he come with them. To suggest that any reasonable person would have felt free to ignore the officers' "request" under those circumstances is to ignore the coercive reality of the circumstances. How was that request any different than when a patrol car pulls up behind a vehicle on the highway with its flashing light activated? Surely the latter example is just a "request" to pull over. Yet for years this Court has held that particularized suspicion is required for such a "request." In fact, to suggest that people are free to ignore what Wagner was requested to do and proceed on their way under the circumstances would not be in the best interests of law enforcement.

¶36    The U.S. Supreme Court's decision in *Mendenhall*, which is relied on by the majority, is distinguishable on its facts. (Neither of the law enforcement officers in that case were uniformed or displaying weapons and the encounter occurred in a large airport which was very public.) If this result could be justified under *Mendenhall*, then I would apply a more realistic test for what constitutes a seizure for purposes of applying Article II, Section 11 of the Montana Constitution.

15

Perhaps people in Montana are just more reasonable and when told by two armed and uniformed highway patrolmen to accompany them and would not think of just walking away or ignoring them.

¶37 As far as the prior Montana case law cited in the majority Opinion, it is certainly hard to find a consistent thread for the meaning of an investigative stop when considering this case together with our prior decision in *Roberts*. In that case, without any directive from law enforcement officers, we held that the mere manner in which they parked their car constituted a seizure. I think most reasonable people would be more concerned with what they were told by police officers than where they happen to park their car.

¶38 Having said all that, I would arrive at the same result as the majority because I would conclude that by the time the officers in this case received a report from an identified citizen informant which was based on that informant's personal observation and then observed the Defendant's car where they were told it would be, and observed the Defendant on the phone in the small convenience store where the informant said he would be, "continually swaying" with an odor of alcohol, they had all the particularized suspicion that was necessary in order to make an investigative stop.

¶39 For these reasons, which are different than those set forth in the majority Opinion, I would affirm the judgments in the District Court.

/S/ TERRY N. TRIEWEILER