FILED

April 14 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 13-0352

DA 13-0352

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2015 MT 103

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

BILLIE RAE DUPREE,

       Defendant and Appellant.

APPEAL FROM:     District Court of the Twelfth Judicial District,
In and For the County of Hill, Cause No. DC 11-106
Honorable Daniel A. Boucher, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Wade Zolynski, Chief Appellate Defender; Kristen L. Larson, Assistant
Appellate Defender, Helena, Montana

    For Appellee:

        Timothy C. Fox, Montana Attorney General; Pamela P. Collins, Assistant
Attorney General, Helena, Montana

        Gina Dahl, Hill County Attorney, Havre, Montana

Submitted on Briefs: February 18, 2015

Decided: April 14, 2015

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Billie Rae Dupree appeals from the Judgment of the Twelfth Judicial Court, Hill County, denying her motion to suppress evidence resulting from a search of her purse. She also challenges her written sentence as inconsistent with the court's oral pronouncement of sentence. We affirm in part, and reverse in part, addressing the following issues on appeal:

¶2 *1. Did the District Court err by denying Dupree's motion to suppress evidence resulting from the search of her purse by police officers?*

¶3 *2. Did the District Court err in its written judgment by altering Dupree's sentence from its oral pronouncement?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 On April 7, 2009, Aaron Wittmer, an officer with the Havre Police Department and a member of the Tri-Agency Safe Trail Drug Task Force, received a phone call from Border Patrol Agent John Mennell. Mennell advised Wittmer he had received a call from an Amtrak employee indicating Dupree would be departing from the train station later that day with drugs in her possession. Sometime later, Wittmer received a second call from Mennell, informing him that Dupree had checked in at the station. Based on the phone calls, Wittmer and Agent Pete Federspiel proceeded to the station to investigate.

¶5 Arriving at the station, the officers located and approached Dupree. After identifying themselves as law enforcement officers, Wittmer and Federspiel told Dupree about the tip they had received. Dupree explained she was expecting them because her boyfriend, Dustin Lamere, had told her that he was making a report to the police. Dupree

2

and Lamere had recently been arguing, precipitating both her planned train trip home and his calling in the tip. The officers asked Dupree whether she would be willing to sign a consent form allowing them to search her luggage. Dupree responded in the affirmative. The officers then asked Dupree if she would be willing to go to a back room to be searched. Dupree again agreed to do so. Upon reaching the back room, Dupree asked what would happen if she declined to consent to a search. The officers explained they would hold her until getting a canine unit to come sniff her luggage. Dupree then acquiesced to the request, signed the consent form, and told the officers to "search the bags."

¶6 While searching Dupree's bags the officers found three prescription pills in unmarked containers in her purse. Dupree indicated the pills were prescription Xanax. Wittmer seized the pills, not recognizing them to be Xanax. The entire interaction lasted about 10 to 15 minutes and Dupree was allowed to depart on her train as scheduled following the encounter. Later, Wittmer obtained an investigative subpoena for Dupree's medical records, confirmed she had never been prescribed Xanax, and identified the pills as Oxycodone.

¶7 Dupree was charged with Criminal Possession of Dangerous Drugs in violation of § 45-9-102, MCA. Dupree moved to suppress the seized pills pursuant to *State v. Pratt*, 286 Mont. 156, 951 P.2d 37 (1997), arguing Lamere's tip failed to establish particularized suspicion and the seizure and search were thus illegal. She also argued that her consent to search was involuntary. The District Court denied the motion to suppress,

finding that "the information provided to Wittmer contained sufficient indicia of reliability to form the basis for his particularized suspicion that Defendant was engaged in criminal activity. Once the agents had corroborated the tip, particularized suspicion existed to lawfully effectuate an investigative stop of Defendant." Dupree appeals.

## STANDARD OF REVIEW

¶8      We review the grant or denial of a motion to suppress to determine whether a district court's findings of fact are clearly erroneous and whether the court correctly interpreted and applied the law to those facts. *State v. Nixon*, 2013 MT 81, ¶ 15, 369 Mont. 359, 298 P.3d 408. A court's determination that particularized suspicion exists is a question of fact reviewed for clear error. *State v. Gill*, 2012 MT 36, ¶ 10, 364 Mont. 182, 272 P.3d 60. A finding of fact is clearly erroneous if not supported by substantial evidence, if the lower court has misapprehended the effect of the evidence, or if our review of the record leaves us with a definite and firm conviction a mistake has been made. *State v. Cooper*, 2010 MT 11, ¶ 5, 355 Mont. 80, 224 P.3d 636.

## DISCUSSION

¶9      *1. Did the District Court err by denying Dupree's motion to suppress evidence resulting from the search of her purse by police officers?*

¶10     Both the United States and Montana Constitutions protect individuals from unreasonable searches and seizures. U.S. Const. amend. IV; Mont. Const. art II, § 11. Section 46-5-401(1), MCA, requires law enforcement officers to have "particularized suspicion" a person "has committed, is committing, or is about to commit an offense" before effecting an investigate stop of the person. To have particularized suspicion

4

sufficient for an investigative stop, a "peace officer must be possessed of (1) objective data and articulable facts from which he or she can make certain reasonable inferences and (2) a resulting suspicion the person to be stopped has committed, is committing, or is about to commit an offense." *State v. Marcial*, 2013 MT 242, ¶ 18, 371 Mont. 348, 308 P.3d 69. Whether particularized suspicion supports an investigative stop is a question of fact, analyzed in context of the totality of the circumstances. *State v. Martinez*, 2003 MT 65, ¶ 23, 314 Mont. 434, 67 P.3d 207. A defendant aggrieved by an unlawful search and seizure may "move the court to suppress as evidence anything obtained by the unlawful search and seizure." Section 46-13-302(1), MCA.

¶11 In light of Dupree's reliance on *Pratt*, the parties focus on the requirements of that case, as did the District Court. *Pratt* addressed an informant's call to police to report a possible DUI offense. A gas station employee believed Pratt was intoxicated and reported him to the police, offering specific information about Pratt's vehicle and the direction in which he was driving. *Pratt*, 286 Mont. at 159, 951 P.2d at 39. It was on the basis of this descriptive information that Pratt was stopped, which we found to be lawful. *Pratt*, 286 Mont. at 168, 951 P.2d at 44. We identified three factors to be considered in determining the reliability of a citizen informant's tip for purposes of creating reasonable suspicion. The factors include: whether the citizen informant identifies himself to law enforcement and thus exposes himself to criminal and civil liability if the report is false; whether the report is based on the personal observations of the informant; and whether

5

the officer's own observations corroborated the information. *Pratt*, 286 Mont. at 165, 951 P.2d at 42-43.

¶12 However, the circumstances here are not governed by the *Pratt* analysis. As we stated in *Martinez*, "[t]he *Pratt* test is a narrowly drawn variant of the *Gopher* analysis and addresses the reliability of a citizen's tip in the context of a DUI investigative stop." *Martinez*, ¶ 37. We explained that *Pratt* is not necessarily limited to a DUI context, but that it should be applied only in those cases where the circumstances parallel a DUI stop. *Martinez*, ¶ 37. Here, the facts do not mirror the stop of a vehicle in the DUI context. Dupree was not operating an automobile, was not suspected of being under the influence, and was in a public area of her choosing when approached by the officers.

¶13 This matter is governed by general particularized suspicion principles, which permit officers to initiate a stop when possessing (1) objective data and articulable facts from which an officer can make certain reasonable inferences and (2) a resulting suspicion the person being stopped has committed, is committing, or is about to commit an offense. Here, Dupree was not stopped while driving a vehicle, but was in a public place. Thus, the question is whether Dupree was subjected to an investigative stop and at what point she was seized.

**The Seizure of Dupree**

¶14 Not all interactions between peace officers and citizens rise to the level of an investigative stop or seizure. *See State v. Wagner*, 2003 MT 120, ¶ 31, 315 Mont. 498, 68 P.3d 840 (where the encounter took place in a public venue of defendant's choosing

6

and his compliance was not compelled by police, no investigative stop occurred); *U.S. v. Mendenhall*, 446 U.S. 544, 554-55, 100 S. Ct. 1870, 1877, 64 L. Ed. 2d 497 (the government may stop and question any individual for any reason as long as the person to whom questions are put remains free to disregard the questions and walk away; such an encounter is not a seizure). A person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed she was not free to leave. *Wagner*, ¶ 27 (citing *State v. Clayton*, 2002 MT 67, ¶ 22, 309 Mont. 215, 45 P.3d 30). Only when an officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *State v. Wilkins*, 2009 MT 99, ¶ 8, 350 Mont. 96, 205 P.3d 797 (citation omitted).

¶15    The District Court found the initial encounter between the officers and Dupree did not constitute a seizure. As the District Court noted, the officers approached Dupree in a public place of her choosing, identified themselves, and told her of the tip. They asked Dupree in permissive terms if she would be willing to sign a consent form allowing a search of her luggage and she indicated she would. After being asked if she would be willing to move to another room, again in permissive terms, Dupree agreed to do so. The officers did not utilize threats or use a show of force to compel compliance. The District Court concluded there was "no evidence in the record which indicates that the agents restrained Defendant's liberty by means of physical force or show of authority." The District Court did not err by concluding that the initial encounter and subsequent

7

relocation to another room did not constitute a seizure. *See Wagner*, ¶ 31 (officer's subsequent request after initial contact that Defendant accompany him outside for further questioning did not constitute an investigative stop).

¶16 The District Court determined that Dupree was seized when she asked about the consequences of a refusal to consent to the search and was told a dog sniff would be initiated. The District Court concluded that the interaction with the officers ceased to be voluntary at that time, as she was advised she would be held until a canine unit could be activated. The District Court correctly determined that at this point in the interaction, a seizure had occurred and particularized suspicion was necessary.

¶17 Although the District Court analyzed the issue under *Pratt*, it was unnecessary here to determine whether the tip provided an independent basis for an investigatory stop. While the tip is important in an analysis of particularized suspicion, Wittmer and Federspiel's initial approach of Dupree in the train station was a routine police encounter for which no particularized suspicion was needed. During the encounter, the officers were able to gather additional information that not only lent credibility to the tip, but was sufficient to constitute particularized suspicion for an investigatory seizure. After talking to Dupree, Wittmer knew that Lamere and Dupree were living together and had prior knowledge of Dupree's involvement in drug related activities. Further, Dupree had confirmed she expected to be stopped by officers and knew they had been advised she would be arriving at a particular location while in possession of drugs. Taken together, there was sufficient information to meet the elements for particularized suspicion.

**Search of Dupree**

¶18  Before signing the consent form, Dupree asked about the consequences of refusal and was advised the officers would get a drug dog to sniff her luggage, which would "take some time."  Dupree argues that, because a canine sniff search requires particularized suspicion under *State v. Tackitt*, 2003 MT 81, ¶ 31, 315 Mont. 59, 67 P.3d 295, the officers' response was only true if particularized suspicion had then been established.  Because Dupree asserts there was not, she contends the statement was a misrepresentation of the law and her consent was thus tainted and involuntary.

¶19  Under both the United States and Montana Constitutions, warrantless searches are per se unreasonable subject to a few limited exceptions.  *State v. Rushton*, 264 Mont. 248, 257, 870 P.2d 1355, 1361 (1994).  One recognized exception to the warrant requirement arises when a citizen has consented to a search.  *Rushton*, 264 Mont. at 257, 870 P.2d at 1361.  Consent must be voluntarily given and uncontaminated by duress or coercion.  *State v. Wetzel*, 2005 MT 154, ¶ 16, 327 Mont. 413, 114 P.3d 269.  To determine whether consent to a search was given freely, we look at the totality of the circumstances.  *State v. Hurlbert*, 2009 MT 221, ¶ 46, 351 Mont. 316, 211 P.3d 869.  We have articulated pertinent factors when considering whether a party has freely given consent to a search, such as: whether the consenting party was in custody or under arrest at the time consent was requested; whether the party was informed of the right not to consent, of her constitutional rights, and that a search warrant could be obtained; and whether she was threatened or coerced in any manner.  *Hulbert*, ¶ 46.  Also pertinent is information

9

regarding the repeated and prolonged nature of the questioning, as well as a person's age, education, and intelligence. *Hulbert*, ¶ 46. When officers misrepresent the law to obtain consent, it may be found that the misrepresentation was coercive in nature and render the consent involuntary. *Rushton*, 264 Mont. at 259, 870 P.2d 1362.

¶20 The District Court found that Dupree was neither under arrest, nor in handcuffs, when she was asked to consent. The court further reasoned that Dupree's questions regarding a refusal to consent indicated she understood her right to refuse compliance. The District Court additionally concluded that, because the officers had lawfully conducted an investigative stop based upon particularized suspicion, Wittmer was empowered to detain Dupree until the canine unit arrived and no misrepresentations of law were made. We agree. As stated, the officers had particularized suspicion by the time Dupree was told a refusal of consent would necessitate the summoning of a drug dog, and the statement was not a legal misrepresentation. The District Court did not err by concluding that the search of Dupree's baggage was lawfully executed based upon her voluntary consent.

¶21 *2. Did the District Court err in its written judgment by altering Dupree's sentence from its oral pronouncement?*

¶22 At the oral pronouncement of her sentence, the court sentenced Dupree to five years at the Montana Women's Prison with three years suspended. The court further imposed fees, fines, and surcharges, ordered to be paid in full "within six months of placement on community supervision." When the court issued its written judgment, however, it stated all fines, fees, and surcharges were to be paid "within six (6) months of

10

the date of sentencing." Dupree argues the nonconforming judgment is unlawful because it "increases her sacrifices of property" and thus departs from the oral pronouncement. The State concedes, and agrees the matter should be remanded to District Court for entry of an amended judgment. Accordingly, we reverse and remand the judgment with instructions to conform the written judgment to the oral pronouncement.

¶23    Affirmed in part, reversed and remanded in part.


                                    /S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER


11