No. 03-342

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 106

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

GARY LEE HALL,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
                In and for the County of Ravalli, Cause No. DC 2001-181
                The Honorable, James H. Haynes, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Dustin Chouinard, Datsopoulos MacDonald & Lind, Missoula, Montana

        For Respondent:

        Honorable Mike McGrath, Montana Attorney General, Mark W. Mattioli,
        Assistant Attorney General, Helena, Montana; George H. Corn, Ravalli
        County Attorney, Geoffrey Mahar, Chief Deputy County Attorney,
        Hamilton, Montana

                        Submitted on Briefs:  October 24, 2003

                               Decided:  April 27, 2004

Filed:

_____
                      Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 The Appellant, Gary Lee Hall, was charged with a fourth offense of driving under the influence of alcohol pursuant to § 61-8-401, MCA, and for driving with a suspended license, pursuant to § 61-5-212, MCA, in the District Court for the Twenty First Judicial District in Ravalli County. Hall filed motions to suppress evidence and to dismiss the felony charge of driving under the influence of alcohol. The District Court denied both motions. After a bench trial, Hall was convicted of the charges. He now appeals. We affirm.

## ISSUES PRESENTED

¶2 On appeal, Hall raises two issues:

1. Whether the police officer had a particularized suspicion to justify the stop; and

2. Whether Hall's three previous convictions in the state of Washington for driving while under the influence were appropriately used to form the basis of his Montana felony charge of driving under the influence of alcohol and/or drugs, fourth offense.

## FACTS

¶3 Bob and Debra Walker made a stop at the Lone Pine Station on the south side of Hamilton, which resulted in Mrs. Walker calling in a report of a drunk driver. While Mr. Walker waited in their truck, Mrs. Walker went inside for a cappuccino. While she was waiting in line, she noticed a man come staggering through the door who she immediately thought was drunk. The man tripped through the door and almost fell down, but caught himself. The man was disheveled, his hat was askew, his shirt was untucked and his eyes were bloodshot. When Mrs. Walker returned to the truck, the couple conferred, agreeing that

2

the man was drunk. Mr. Walker indicated that after the man parked his truck across the painted parking lines and perpendicular to Mr. Walker's truck, the man staggered about, reached into his pockets and pulled them out and dropped some money. The man paused for a long time, staring at his hands before staggering into the store, leaving the money he dropped on the ground. The couple agreed that the man was obviously too drunk to drive.

¶4 The Walkers watched the man leave the store and get into the driver's side of his truck. So as not to appear suspicious, the Walkers slowly drove away while Mrs. Walker used her cell phone to call 9-1-1. She identified herself and gave a description of a drunk man driving a black and maroon Ford pickup truck, with a blonde female passenger and a dog in the back-end wearing an orange vest, and gave the truck's license plate number. Because they were driving away, Mrs. Walker could not say which direction the man was traveling, so the dispatcher called the Lone Pine Station. The clerk confirmed that a drunk man had just been in there, but because it was so busy, he could not give the direction of travel.

¶5 Meanwhile, Hamilton Police Officer Hochalter was parked in the parking lot of Al's Car Care on the 93 strip in Hamilton when he received the dispatcher's report at 9:16 p.m., relaying the information supplied by Mrs. Walker. Within two minutes, a black and maroon Ford truck driven by a man with a blonde female passenger and a dog in the back-end wearing an orange vest drove by in the lane closest to Officer Hochalter. He followed the truck for four to five blocks, watching for signs of erratic driving. But the truck drove at the 25 mile per hour speed limit and appropriately signaled to change lanes. When the truck

3

pulled in to the Gas N' Grub and Hall got out of the driver's side, Officer Hochalter pulled in right behind the truck, just turning on his emergency flashers to let Hall know they needed to talk.

¶6     Hochalter's investigation quickly revealed that Hall smelled of alcohol. Hall admitted to having drunk between six to eight beers. Hochalter then administered field sobriety tests which indicated that Hall was intoxicated. After refusing to take a Preliminary Breath Test (PBT), Hochalter arrested Hall for driving under the influence.

## DISCUSSION

¶7     We review a district court's denial of a motion to suppress evidence to determine whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Nelson*, 2004 MT 13, ¶ 5, 319 Mont. 250, ¶ 5, 84 P.3d 25, ¶ 5. Our review of statutory interpretation is plenary, and our standard of review is whether the tribunal's interpretation of the law is correct. *State v. McNally*, 2002 MT 160, ¶ 5, 310 Mont. 396, ¶ 5, 50 P.3d 1080, ¶ 5.

*1. Did the police officer have a particularized suspicion to justify the stop?*

¶8     Hall claims that Officer Hochalter lacked sufficient reliable objective data to form a particularized suspicion of wrongdoing, and that his stop was therefore illegal. The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect persons against unreasonable searches and seizures. Whenever a police officer restrains a person's freedom, such as in a brief investigatory stop of a vehicle, the officer has seized that person. *State v. Reynolds* (1995), 272 Mont. 46, 49, 899 P.2d 540,

4

542. However, Montana recognizes that an investigatory stop is reasonable when an officer has a particularized suspicion that the person has committed or is committing an offense. *State v. Lacasella*, 2002 MT 326, ¶ 19, 313 Mont. 185, ¶ 19, 60 P.2d 975, ¶ 19; codified at § 46-5-401, MCA. To evaluate whether a police officer has a particularized suspicion to make an investigatory stop, the State has the burden to show:

> (1) objective data from which an experienced officer can make certain inferences; and (2) a resulting suspicion that the occupant of the vehicle is or has been engaged in wrongdoing or was a witness to criminal activity.

*State v. Martinez*, 2003 MT 65, ¶ 22, 314 Mont. 434, ¶ 22, 67 P.3d 207, ¶ 22. The existence of a particularized suspicion is determined by the totality of the circumstances. *State v. Henderson*, 1998 MT 233, ¶ 12, 291 Mont. 77, ¶ 12, 966 P.2d 137, ¶ 12.

¶9 In *State v. Pratt* (1997), 286 Mont. 156, 951 P.2d 37, we adopted a three factor test to evaluate the totality of the circumstances when an investigative stop is made pursuant to a tip. *State v. Elison*, 2000 MT 288, ¶ 16, 302 Mont. 228, ¶ 16, 14 P.3d 456. The first factor is whether the informant remains anonymous or subjects herself to civil and criminal liability. The second factor is whether the report is based on personal observations. The third factor is whether the officer's own observations corroborate the informant's information.

¶10 According to Hall, Officer Hochalter lacked sufficiently reliable objective data to form a particularized suspicion according to the *Pratt* test. Officer Hochalter testified that he did not know from the dispatcher whether the tip was anonymous or if it was from an identified citizen. Further, the dispatcher did not relay the personal observations of the caller

5

to Officer Hochalter. Lastly, Officer Hochalter admitted that Hall's driving was not erratic. Thus, according to Hall, the totality of the circumstances fail to support a particularized suspicion.

¶11    However, we rejected this same argument in *Pratt*, concluding that an officer in the field does not have to personally assess the reliability of the tip given to dispatch. *Pratt*, 286 Mont. at 167, 951 P.2d at 44. In *Pratt*, we looked to the decisions of the United States Supreme Court in *United States v. Hensley* (1985), 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (an officer unaware of the factual basis for the reasonable suspicion may make an investigative stop in reliance on a report or bulletin from another law enforcement agency so long as the reporting person possessed the requisite suspicion); and *Whitley v. Warden* (1971), 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (an officer who is unaware of the factual basis for probable cause may make an arrest upon the directive of another officer with probable cause). We also quoted the Ninth Circuit case of *United States v. Robinson* (9th Cir. 1976), 536 F.2d 1298, "effective law enforcement cannot be conducted unless police can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." 536 F.2d at 1299.

¶12    Other courts, in considering a motion to suppress based on a citizen's tip, reject the narrow rule advanced by Hall, that only the information known to the investigating officer is to be considered. Instead, courts find it appropriate to consider the knowledge of the officer or dispatcher who relayed the tip or other information. The Ninth Circuit, under the

6

totality of the circumstances, looks to the information relayed to the officer in the field and the information known to the dispatcher. *United States v. Fernandez-Castillo* (9th Cir. 2003), 324 F.3d 1114, 1118 (highway patrol officer had a reasonable suspicion under the totality of the circumstances when a Montana Department of Transportation employee reported erratic driving which was relayed to a highway patrol officer, who then encountered the vehicle and corroborated erratic driving). Massachusetts recently determined there was a reasonable suspicion to make an investigatory stop premised on the informant's basis of knowledge and what he relayed to the dispatcher. *Commonwealth v. Riggieri* (Mass. 2003), 782 N.E.2d 497, 500 (an off-duty reserve officer followed an erratic driver and gave updates via his cell-phone to the arresting officer who did not witness evidence of wrongdoing). In *Feathers v. Aey* (6th Cir. 2003), 319 F.3d 843, the Sixth Circuit determined that it was appropriate to impute to the arresting officer the dispatcher's knowledge that the tipster remained anonymous, and therefore, there was an insufficient indicia of reliability to give rise to a reasonable suspicion. Similarly, the Tenth Circuit employs the "fellow officer" rule, which considers the pool of information known to all the officers involved in the stop or arrest in order to determine the existence of a reasonable suspicion under the totality of the circumstances. *United States v. Hinojos* (10th Cir. 1997), 107 F.3d 765, 768 (an anonymous tip was relayed to the investigating officer who independently corroborated the information).

¶13    Jurisdictions which have limited the scope of inquiry to the knowledge of the arresting or investigating officer also applied the rule from *U.S. v. Hensley*, 469 U.S. 221, allowing officers to rely on a report from another officer or dispatch. The resulting

7

combination of the two rules lends to a finding of reasonable suspicion based solely on the officer's reliance on the report from dispatch, without an inquiry into the basis of knowledge of the dispatcher's report. *See, e.g. City of Maumee v. Weisner* (Oh. 1999), 720 N.E.2d 507, 511. Such a situation is ripe for abuse. The Missouri Supreme Court rejected such a rule, stating that, "[t]he requirements of reasonable suspicion and probable cause would be rendered meaningless if police could simply filter a 'hunch' through a radio or cellular phone and have it come out reliable on the other end." *State v. Miller* (Mo. 1995), 894 S.W.2d 649, 653 (under the totality of the circumstances the Court considered an anonymous tip relayed by dispatch as well as the collective information known to the officers involved in the stop, concluding there was no reasonable suspicion). Missouri continues to analyze the knowledge of each of the officers as well as the information told to the dispatcher. *State v. Monath* (Mo. 2001), 42 S.W.3d 644, 650 (there was a reasonable suspicion when store clerks relayed information of two individuals buying large quantities of pseudoephedrine, which was corroborated by the police investigation).

¶14    In Ohio, the appellate courts had a split of authority for situations where an investigative stop was made in sole reliance on a police dispatch. *City of Maumee*, 720 N.E.2d 507. The Ohio Supreme Court resolved the split by requiring the state to demonstrate that the facts which precipitated the dispatch justified a reasonable suspicion, and so rejected the rule which found it was sufficient for the police to merely rely on the dispatch without a showing of the information available to the dispatcher. 720 N.E.2d at 511.

8

¶15 Based on the foregoing, *Pratt* was correct in that an officer in the field must be able to rely on reports and dispatches from other officers without having to conduct a cross-examination as to the basis of the report. However, under our three factor analysis of *Pratt*, when a tip has been relayed from dispatch and an officer has acted on that information, it is appropriate to look beyond the stopping or investigating officer to include the information known to the dispatching or reporting officer. Here, although the dispatcher did not testify, the dispatcher's transcript and log were entered into evidence. From the record it is apparent that Mrs. Walker called and reported a drunk driver, giving a detailed description of the vehicle. Mrs. Walker stated that the man was, "so drunk, he can't even hardly walk" and that "he just about fell down, he's so drunk." The veracity of Mrs. Walker's report was further supported when the dispatcher called the clerk at the Lone Pine Station, who, when told about the report of a "really drunk guy" responded that, "he was just in and went out . . ." Thus, there was one named citizen informant who relayed information, and the details of the information support that it was based on personal observations. The indicia of reliability of Mrs. Walker's report was further bolstered by the affirmative response of the store clerk. These facts lend to a high indicia of reliability in regard to the first two *Pratt* factors.

¶16 As for the third *Pratt* factor, Officer Hochalter saw the vehicle only a few minutes after getting the report and it matched the detailed description. Furthermore, Hochalter waited until Hall had pulled into a gas station and had gotten out. Neither Hall nor the State address at what point Hochalter's response became an investigatory stop. In a similar situation in *State v. Wagner*, 2003 MT 120, 315 Mont. 498, 63 P.3d 840, the responding

officer found the reported drunk driver had already parked his vehicle and was at a pay phone. There, we concluded that the initial encounter between officers and the defendant was not a stop, because it was at a public venue of the defendant's own choosing and absent a show of force or authority, the defendant was free to walk away. *Wagner*, ¶ 31. Similarly here, Hall himself stopped at the gas station and got out of his vehicle, unaware that Officer Hochalter had pulled in behind him. Hall was unsteady on his feet as he walked around the truck to get gas. When Hall realized that a police car was parked right behind him, he stopped what he was doing and attempted to get into the cab of his truck, at which point, Officer Hochalter grabbed him. Following *Wagner*, Hall was clearly not free to leave after Hochalter physically grabbed and detained him. For the purposes of the *Pratt* third factor corroboration, Hochalter's observations prior to the stop included encountering the described vehicle within a short time of receiving the dispatch, Hall's eyes were red and watery, he smelled of alcohol and was unsteady on his feet. Furthermore, Hall attempted to leave when he realized a police officer was behind him, implicating *Illinois v. Wardlow* (2000), 528 U.S. 119, 125, 120 S.Ct. 673, 676, 145 L.Ed.2d 570, 577 (unprovoked evasive behavior and headlong flight when police officers appear may create a reasonable suspicion). Under the totality of the circumstances, these facts satisfy the factors of the *Pratt* test.

> *2. Whether Hall's three previous convictions in the state of Washington for driving while under the influence appropriately used to form the basis of his Montana felony charge of driving under the influence of alcohol and/or drugs, fourth offense?*

¶17 Montana law provides that the fourth or subsequent conviction of driving under the influence is a felony. Section 61-8-731, MCA. The previous convictions which may be used in the calculation include violations of Montana's driving under the influence laws, §§ 61-8-401, & 406, MCA, as well as convictions of similar statutes and regulations of other states. Section 61-8-734, MCA. Hall claims that the state of Washington's statute is not similar to Montana's statutes, because the Washington statute requires a lesser degree of culpability.

¶18 We addressed a similar claim in *State v. McNally*, 2002 MT 160, 310 Mont. 396, 50 P.3d 1080, where we determined that Colorado's driving while ability impaired (DWAI) statute was insufficiently similar to Montana's statute for the purpose of enhancing a charge to a fourth offense felony DUI. *McNally*, ¶ 22. Although Colorado had a DUI statute, which was similar in nature to Montana's driving under the influence statutes, there was no statute in Montana comparable to Colorado's DWAI statute. Colorado's DWAI standard allowed for a conviction if a person was impaired "to the slightest degree." The Montana Legislature had considered and rejected using the phrase "to the slightest degree," and decided to use the standard of "diminished" in its stead. *McNally*, ¶ 21. We determined that "to the slightest degree" was a lesser degree of culpability than "diminished," and therefore, convictions under Colorado's DWAI statute could not be used in Montana to enhance an offense to a felony fourth violation.

¶19 We now consider the issue of whether or not Washington's drunk driving laws are sufficiently similar so as to enhance Hall's Montana conviction to a fourth offense. Under Montana law, a person may be convicted for a *per se* violation of driving under the influence

11

if the person's blood alcohol concentration is greater than 0.10. Section 61-8-406, MCA (2001) (Hall's conviction was under the old standard, which the 2003 legislature lowered to 0.08 BAC for a *per se* violation). Alternatively, a person may be convicted if he operates a vehicle under the influence, meaning that the person's ability to safely operate a vehicle had been diminished, which may be supported by certain inferences of the person's BAC. Section 61-8-401, MCA.

¶20 Washington's statutory scheme also criminalizes driving under the influence, with a generic category, and a *per se* category. The main difference between Montana and Washington is in the organization of the statutes. Washington only has one offense, rather than two separate offenses as in Montana. However, the Washington statute "sets out alternate methods of committing the crime of driving while under the influence." *State v. Franco* (Wa. 1982), 639 P.2d 1320, 1323. While each subsection provides alternate methods for committing the same offense, those subsections are analogous to Montana's two statutes. Both states disallow driving with a BAC in excess of 0.10 (Wash. Rev. Code § 46.61.502(1) & (2), and § 61-8-406, MCA) and driving under the influence of intoxicating drugs or liquor (Wash. Rev. Code § 46.60.502(3) & (4), and § 61-8-401, MCA).

¶21 Hall claims the Washington standard of culpability is best described by its case of *State v. Hansen* (Wa. Ct. App. 1976), 546 P.2d 1242, where the Washington Court of Appeals affirmed the use of the following jury instruction: "A person is deemed to be under the influence of or affected by intoxicating liquor if such person's ability to handle a motor vehicle is lessened in any appreciable degree." 546 P.2d at 1243. Hall places great weight

on the use of the phrase "any appreciable degree" and claims it is similar to "in the slightest degree," which was at issue in *McNally*. Although *Henson* interpreted Wash. Rev. Code § 46.61.515, and Hall was convicted of violating Wash. Rev. Code § 46.61.502, which prohibits driving while intoxicated (DWI), the *Henson* standard of "any appreciable degree" appears to still apply. *See*, *State v. Randhawa* (Wa. 1997), 941 P.2d 661, 664. The Washington standard of "any appreciable degree" bears obvious similarities to the Colorado standard of "in the slightest degree," as was at issue in *McNally*. However, in *McNally*, we recognized that Colorado's DUI statute was similar to Montana's DUI statutes, but that the culpability of "to the slightest degree" for DWAI (driving while ability impaired) had no comparable counterpart in Montana, because it makes it illegal to drive after consuming any alcohol. Therefore, we concluded that a Colorado conviction for DWAI could not be used to enhance the Montana offense to a fourth or subsequent felony offense. Although Washington established its *per se* standard after its decision of *Hansen* in 1976, it is only a *per se* violation to have a BAC in excess of 0.10 (now 0.08, just as in Montana). Even with a *per se* standard, the logic of *Hansen* continues to apply in Washington, that a person may have drunk liquor and yet, not be under the influence of it to the extent that driving is proscribed by law. *State v. Franco* (Wa. 1982), 639 P.2d 1320, 1324 (citing *Hansen*, 546 P.2d at 1242). Thus, although Washington's DUI statute has a *per se* subsection, it is more similar to Montana's *per se* statute than it is to Colorado's DWAI statute.

¶22     Hall also claims that it is inappropriate to use his Washington DWI convictions to enhance his Montana DUI conviction because the Washington law combines the *per se* DWI

and regular DWI into one statute. The result, according to Hall, is that Washington does not allow the defendant to establish innocence by way of lack of impairment, in spite of a BAC in excess of the limit, while such a person would be allowed to establish innocence in Montana. Hall is correct, in that a person charged with driving under the influence, § 61-8-401, MCA, who had a BAC over the legal limit might nonetheless be able to establish that his or her ability to safely operate a vehicle had not been diminished, and thus, he or she was not in violation of § 61-8-401, MCA. However, Hall's analysis fails to take into account that such a person would have violated Montana's *per se* statute, § 61-8-406, MCA, where a crime would have occurred regardless of the level of impairment. While we do not necessarily know which sub-section of Wash. Rev. Code § 46.61.502 the defendant violated, whether it was the regular DWI or the *per se* aspect, *see, e.g., Franco*, 639 P.2d at 1324 (the jury need only be unanimous as to guilt of the overall offense but need not be unanimous as to guilt of a particular subsection), it is nonetheless certain that a person convicted of violating Wash. Rev. Code § 46.61.502 committed an offense for which each sub-section has an analogous statute in Montana. Therefore, the decision of the district court was correct. We affirm the order of the district court.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ JIM REGNIER

14

/S/ JIM RICE