No. 04-001

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 210N

STATE OF MONTANA,

      Plaintiff and Respondent,

   v.

ALAN JAY LABUDA,

      Respondent and Appellant.


APPEAL FROM:    District Court of the Twelfth Judicial District,
                     In and for the County of Hill, Cause No. DV 2003-011
                     The Honorable John C. McKeon, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

          Jeremy S. Yellin, Attorney at Law, Havre, Montana

      For Respondent:

          Honorable Mike McGrath, Montana Attorney General, Jennifer Anders,
          Assistant Attorney General, Helena, Montana; Cyndee Peterson, Hill County
          Attorney, Gina Bishop, Chief Deputy Hill County Attorney, Havre, Montana


                            Submitted on Briefs:  May 19, 2004

                                 Decided:  August 10, 2004


Filed:

             _____
                           Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent. The decision shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2    Alan Jay Labuda (Labuda) appeals the judgment of the Twelfth Judicial District Court, Hill County, denying his motion to suppress.

¶3    We address the following issue on appeal and affirm: Did the officers have particularized suspicion in stopping the minivan in which Labuda was a passenger?

### FACTUAL AND PROCEDURAL BACKGROUND

¶4    On May 28, 2002, Alex Giles (Giles), a traveling salesperson, was driving from Great Falls back home to Havre. Around Big Sandy, Giles noticed that a vehicle had pulled out behind him. The vehicle was traveling in the same direction as Giles; however, it was traveling on the wrong side of the road. The vehicle eventually returned to the right side of the road as it neared the Big Sandy city limits.

¶5    The vehicle then passed Giles, during which time Giles noted that the vehicle was "a dark colored Chevy pickup." Giles then noticed that the vehicle "began drifting from one lane to the other, close to the ditch," and that another vehicle that the driver of the pickup had also passed "had to get to the shoulder of the road" to let the driver of the pickup by, as

2

the driver did not pass in the appropriate lane.

¶6 Giles called 911, telling the dispatcher that he thought that the driver of the pickup was driving under the influence. The 911 dispatcher asked Giles if it was possible for him to get a license number. Hence, Giles drove "between 95 and 100 miles an hour" in order to "catch" the pickup, traveling a distance of "14 or 15 miles" before getting behind the pickup. Giles was then "a few feet behind," the pickup, and he gave the dispatcher the license number. He also noticed that the driver of the pickup "appeared to have kind of longer, bushier hair and seemed to be wearing a baseball cap." When asked for an estimation of the driver's height, Giles told the dispatcher that based on how tall the driver seemed to sit in the driver's seat, he estimated the driver's height to be "around six-feet tall."

¶7 Giles and the driver of the pickup then entered the town of Laredo, at which time Giles pulled over and watched the driver drive to a residence. Giles then observed the driver go back and forth from his residence to the pickup several times. He then saw another vehicle--a minivan--turn off of the highway and drive to the same residence.

¶8 Giles next observed "the person that appeared to be driving the pickup" get into the minivan. It was at this time that the summoned officers arrived, namely Deputy Dwyer and Deputy Ross. However, before arriving, Deputy Dwyer received information from the dispatcher that the vehicle matching the license and description relayed to her by Giles came back registered to Labuda.

¶9 Upon arriving, Deputy Dwyer and Giles began talking "for a short time," after which

the minivan left the residence and proceeded to drive towards Giles, Deputy Dwyer, and Deputy Ross. At that time, Deputy Dwyer stopped the minivan. Deputy Ross advised Deputy Dwyer that he recognized the passenger in the minivan as Labuda. Deputy Dwyer then spoke to Labuda, noting Labuda "was slurring his words," and that he had to repeat the questions he was asking Labuda several times because he could not understand Labuda's answers. Deputy Dwyer asked Labuda several questions without first giving him a *Miranda* warning. Ultimately, Deputy Dwyer concluded that Labuda had been driving under the influence. Another patrol officer then removed Labuda from the minivan and took Labuda into custody.

¶10 Labuda moved to suppress the statements he made to Deputy Dwyer, which the District Court denied. Ultimately, Labuda pled guilty to the charge of driving under the influence of alcohol, second offense, reserving his right to appeal the denial of his motion to suppress.

¶11 Labuda now appeals the District Court's denial of his motion to suppress.

## STANDARD OF REVIEW

¶12 We review a district court's grant or denial of a motion to suppress to determine whether the district court's findings of fact are clearly erroneous and whether the district court's conclusions of law were correctly applied as a matter of law. *State v. Henderson*, 1998 MT 233, ¶ 9, 291 Mont. 77, ¶ 9, 966 P.2d 137, ¶ 9. A district court's findings of fact are clearly erroneous if they are not supported by substantial evidence; if the district court misapprehended the effect of the evidence; or if a mistake has been committed. *Henderson*,

4

¶ 9.

## DISCUSSION

**¶13     Did the officers have particularized suspicion in stopping the minivan in which Labuda was a passenger?**

¶14     Labuda argues that "[t]here is no record that either of the deputies were provided with any identification of the suspect by Giles before or during the time of the stop of the van." In addition, Labuda argues that "[t]he only, on record, connection between the van and the suspected pickup . . . was that it [the minivan] was coming from the general direction of where the pickup was seen in a stopped position." Such information, Labuda contends, does not constitute objective data connecting the minivan to the driver of the pickup. Hence, the stop of the minivan was illegal, and any evidence derived from the stop must be suppressed.

¶15     The State of Montana (the State) argues that "substantial evidence" connected Labuda to the events that Giles witnessed. Specifically, the State argues that: (1) Giles followed the pickup and saw it pull into a residence; (2) Giles never lost sight of the pickup and watched the driver go to and from the pickup into the residence; and (3) Giles testified that he believed the driver of the pickup was the same person in the minivan whom the officers stopped. Hence, the State argues that "there was adequate evidence from which the district court" could make the inference that Labuda--the passenger in the minivan--was also the erratic driver of the pickup.

¶16     Under § 46-5-401(1), MCA, "a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense." The

5

existence of particularized suspicion is a question of fact, which a district court determines in light of the totality of circumstances. *State v. Lacasella*, 2002 MT 326, ¶ 20, 313 Mont. 185, ¶ 20, 60 P.3d 975, ¶ 20. Particularized suspicion exists if: (1) an officer has objective data from which to make certain inferences; and (2) the officer also has a suspicion that the occupant of the vehicle is or has been engaged in wrongdoing. *Lacasella*, ¶ 20.

¶17 We adopted a three factor test in *State v. Pratt* (1997), 286 Mont. 156, 165, 951 P.2d 37, 42-43, to evaluate the totality of the circumstances under which an investigative stop is made pursuant to a tip. These factors include whether: (1) the informant remains anonymous or subjects himself to civil and criminal liability; (2) the report is based on personal observations; and (3) the officer's own observations corroborate the informant's information. *State v. Hall*, 2004 MT 106, ¶ 9, 321 Mont. 78, ¶ 9, 88 P.3d 1273, ¶ 9.

¶18 In addition, we held in *State v. Elison*, 2000 MT 288, 302 Mont. 228, 14 P.3d 456, that the officer had particularized suspicion to stop Elison based on "Gibson's [the non-anonymous informant's] report . . . [regarding] his personal observation of Elison smoking from a brass pipe, appearing startled upon noticing the patrol car and attempting to hide the pipe from view; Officer Conrad's corroboration of Gibson's description of the vehicle; and Officer Conrad's independent observation of Elison's subsequent driving behavior which appeared suspicious in light of Gibson's report." *Elison*, ¶¶ 22, 23. We held that "[t]hese facts [we]re reliable objective data from which Officer Conrad could make certain inferences, based on his [Officer Conrad's] four years of experience and training, which would lead to a resulting suspicion that Elison was engaged in wrongdoing." *Elison*, ¶ 22.

6

¶19 In *Elison*, the officer was informed by the non-anonymous informant that he observed Elison "smoking from what he believed to be a marijuana pipe and that . . . [Elison] . . . appeared startled and attempted to hide the pipe." *Elison*, ¶ 7. The officer in *Elison* did not witness any of the activity that the non-anonymous informant had, but the officer did locate the truck that Elison was driving. *Elison*, ¶ 7. At that point, the officer stopped Elison's vehicle and "immediately smell[ed] the odor of marijuana," and noticed that "Elison appeared nervous, his eyes were red and glassy, and he would not sit still." *Elison*, ¶ 8.

¶20 Here, just as in *Elison*, the non-anonymous informant, Giles, observed Labuda's erratic driving, followed Labuda to a residence, and observed Labuda exit his pickup, go to and from his residence, and get into a minivan that arrived some time later. Giles relayed his observations to Deputy Dwyer, upon Deputy Dwyer's arrival near the residence. Deputy Dwyer then observed the minivan pass by him, and was advised by Deputy Ross that Labuda was in the passenger side. At that point, Deputy Dwyer stopped the minivan, and subsequently noted that Labuda had difficulty in answering the questions asked of him and that Labuda noticeably slurred his words.

¶21 Just as we held in *Elison*, Deputy Dwyer's corroboration met the third factor of the *Pratt* test. And, ultimately, all three factors of the *Pratt* test were established, and Deputy Dwyer had particularized suspicion to justify his stop of Labuda.

¶22 There was an unbroken chain of events and observations starting with Giles's observations of Labuda driving on the wrong side of the road, to Giles's observations of Labuda's pickup "drifting from one lane to the other," to Giles's observations of another

7

vehicle having to get onto the shoulder of the road to facilitate Labuda's passing, to Giles's following of Labuda's pickup, to Giles's observations of Labuda driving to a residence, wherein Labuda went to and from the residence and his pickup, to Giles's observations of the minivan arrival and Giles entering the minivan on the passenger side, to Giles's statements to Deputy Dwyer and Deputy Ross of his observations, to Deputy Dwyer's stop of the minivan and Deputy Dwyer's personal observations of Labuda's state of apparent intoxication following the stop. All three parts of the the *Pratt* test were satisfied. Hence, particularized suspicion existed upon which Deputy Dwyer had objective data and a resulting suspicion that Labuda was driving under the influence of alcohol. Therefore, we hold that the District Court did not err in denying Labuda's motion to suppress, as the deputies had particularized suspicion to arrest Labuda for driving under the influence of alcohol.

¶23   Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER
/S/ JIM RICE

8