No. 04-849

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 278

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

DAVID JON MYHRE,

        Defendant and Appellant.


APPEAL FROM:    District Court of the First Judicial District,
                      In and For the County of Broadwater, Cause No. DC 2004–12
                      Honorable Dorothy McCarter, Presiding Judge


COUNSEL OF RECORD:

        For Appellant:

                Jeffrey L. Sutton; Hartelius, Ferguson, Baker & Kazda,
                Great Falls, Montana

        For Respondent:

                Hon. Mike McGrath, Attorney General; Joslyn M. Hunt,
                Assistant Attorney General, Helena, Montana

                John Flynn, Broadwater County Attorney, Townsend, Montana


                      Submitted on Briefs:  September 27, 2005

                                Decided:  November 8, 2005


Filed:

                    _____
                                Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1     David Jon Myhre (Myhre) appeals from his conviction and sentence in the First Judicial District Court, Broadwater County, for driving under the influence of alcohol (DUI). We affirm.

¶2     The issue on appeal is whether the District Court erred in denying Myhre's motion to dismiss the case.

## BACKGROUND

¶3     On the evening of September 20, 2003, Colleen Yunis (Yunis) was driving from Hardin, Montana, to Butte, Montana, with her mother and her two children. As they approached Bozeman, Montana, Yunis observed a pickup truck approach from behind, pass her vehicle and proceed ahead of her down the highway. Yunis was traveling the speed limit and the truck was traveling faster. Yunis noticed that, although it was dark outside, the truck did not have its lights on. She also observed that the truck was swerving in its lane of travel and crossing over the line dividing the two lanes of travel. Concerned that the driver of the truck might be intoxicated, Yunis called 911 emergency dispatch on her cell phone to report the driver. Yunis described the truck and its actions to the 911 dispatcher, and gave the truck's location on the highway in reference to mile marker posts. Eventually, the truck came to a stop along the side of the highway. Yunis felt uncomfortable about passing the truck, so she parked alongside the highway some distance back. She then waited approximately five minutes until a law enforcement officer arrived.

2

¶4 In the meantime, the 911 dispatcher contacted the Montana Highway Patrol, which dispatched Officer Marvin Reddick (Reddick) to respond to the call. Reddick located the two vehicles parked along the highway, drove past Yunis' vehicle and pulled in behind the truck. Reddick observed that the truck was not running and its lights were not on. He walked up to the driver's side door and saw that the driver--later identified as Myhre--appeared to be asleep. When Reddick knocked on the truck's window, Myhre awoke and exited the truck. Reddick eventually arrested Myhre for DUI.

¶5 The State of Montana (State) charged Myhre by complaint in the Broadwater County Justice Court with misdemeanor DUI. Myhre moved to suppress all evidence obtained after Reddick approached his vehicle on the basis that Reddick did not have a particularized suspicion of wrongdoing sufficient to justify an investigative stop. The Justice Court denied the motion. The Justice Court subsequently held a bench trial, found Myhre guilty of DUI, sentenced him and entered judgment on the conviction and sentence. Myhre appealed to the District Court for trial *de novo*.

¶6 Myhre moved the District Court to dismiss the case, again arguing that Reddick did not have particularized suspicion sufficient to justify the investigative stop of his vehicle. The District Court held an evidentiary hearing, following which it denied Myhre's motion to dismiss. The case proceeded to a jury trial and the jury found Myhre guilty of DUI. The District Court sentenced Myhre and ordered execution of the sentence stayed pending appeal to this Court. Myhre appeals.

STANDARD OF REVIEW

3

¶7    A district court's ruling on a motion to dismiss in a criminal proceeding is a question of law which we review *de novo*. *State v. White Bear*, 2005 MT 7, ¶ 5, 325 Mont. 337, ¶ 5, 106 P.3d 516, ¶ 5.

## DISCUSSION

¶8    Did the District Court err in denying Myhre's motion to dismiss the case?

¶9    As stated above, Myhre moved the District Court to dismiss the charge against him based on his contention that Reddick did not have sufficient particularized suspicion of wrongdoing to justify the investigative stop of Myhre's vehicle. The District Court held an evidentiary hearing and entered written findings of fact, conclusions of law and an order denying Myhre's motion to dismiss. The court determined that, considering the totality of the circumstances surrounding the incident, citizen informant Yunis had provided sufficient reliable information to support a particularized suspicion justifying Reddick's investigative stop. Myhre asserts error.

¶10    Myhre's argument on appeal consists of two subparts. First he contends that, notwithstanding Myhre's truck was not actually in motion at the time, Reddick was conducting an investigatory stop when he approached the truck on the side of the highway rather than performing a community caretaking function. Second, Myhre contends that Reddick did not have the particularized suspicion required to perform such an investigative stop. The State does not respond to Myhre's argument regarding whether the stop was for investigative or community caretaking purposes, thus implicitly conceding that an

4

investigative stop occurred. Consequently, we address only whether Reddick had the requisite particularized suspicion to justify the investigative stop.

¶11 In Montana, law enforcement officers are authorized by statute to conduct investigative stops under certain circumstances. In that regard, § 46-5-401(1), MCA, provides, in pertinent part, that

> [i]n order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

In applying this statute, we have stated that particularized suspicion exists where a peace officer has objective data from which the officer can make certain inferences and a suspicion resulting from those inferences that the person to be stopped is, or has been, engaged in some wrongdoing. *State v. Fellers*, 2004 MT 321, ¶ 21, 324 Mont. 62, ¶ 21, 101 P.3d 764, ¶ 21. The existence of a particularized suspicion is a question of fact which is determined by examining the totality of the circumstances surrounding the stop. *State v. Britt*, 2005 MT 101, ¶ 8, 327 Mont. 1, ¶ 8, 111 P.3d 217, ¶ 8. In evaluating the totality of the circumstances, courts consider the quantity, or content, and quality, or degree of reliability, of the information available to the peace officer. *Britt*, ¶ 8.

¶12 It is undisputed here that Reddick did not personally observe any activity, such as erratic driving or a traffic law violation, which would support a particularized suspicion for him to conduct an investigative stop of Myhre's vehicle. However, an officer need not personally observe illegal activity in order to have particularized suspicion justifying an

5

investigative stop. *Fellers*, ¶ 21. Particularized suspicion may be based on information obtained via a citizen informant, as long as the informant's information contains sufficient indicia of reliability. *See State v. Pratt* (1997), 286 Mont. 156, 164-68, 951 P.2d 37, 42-44. In that regard, we previously have set forth three factors which are important in weighing and determining the reliability of a citizen informant's tip. *See Pratt*, 286 Mont. at 165, 951 P.2d at 42-43.

¶13　Myhre contends that analyzing the totality of the circumstances surrounding the stop of his vehicle in the context of the three *Pratt* factors reveals that Reddick lacked the requisite particularized suspicion of wrongdoing to conduct the investigatory stop. The State responds that application of the *Pratt* factors to the facts of this case establishes that Yunis' information was reliable and provided sufficient basis for the investigatory stop. We address each of the three *Pratt* factors in turn.

¶14　The first *Pratt* factor provides that a citizen informant's tip may be considered more reliable where the citizen identifies him or her self, thereby exposing the citizen to criminal or civil liability if the information is false. *Pratt*, 286 Mont. at 165, 951 P.2d at 42. At the evidentiary hearing on Myhre's motion to dismiss, the State entered into evidence an audio tape of the telephone conversation between Yunis and the 911 dispatcher on the night of Myhre's arrest. The audio tape reveals that when Yunis called 911, she gave the dispatcher her first name and her cell phone number, and informed the dispatcher that she was from Hardin, Montana. Yunis also described the make, model, year and color of the vehicle she

6

was driving, as well as giving the first two numbers of her vehicle's license plate indicating the county in which her vehicle was registered.

¶15 Myhre points out that the written call for service report printed by the highway patrol dispatcher indicates that Yunis was from Gallatin County, rather than Big Horn County where Hardin is located, and lists an incorrect prefix for Yunis' cell phone number. At the hearing in the District Court, Reddick testified that this mixup occurred when the 911 dispatcher relayed the information from Yunis' cell phone call to the highway patrol dispatcher. Reddick also testified that he contacted the original 911 dispatcher several days later, obtained Yunis' correct phone number and eventually located Yunis in order to take a statement from her regarding the incident. Myhre asserts that, notwithstanding Reddick's ability to search down and talk to Yunis several days after his arrest, the misinformation in the written report results in Yunis' information being unreliable because "[t]he information is not reliable unless the identity of the citizen informant has been confirmed prior to the investigative stop." Thus, according to Myhre, because Reddick did not personally have the correct information identifying the citizen informant, he could not rely on the citizen's information to establish particularized suspicion. Myhre's contention is without merit.

¶16 We rejected a contention identical to Myhre's in *Pratt*. There, the defendant argued that the officer initiating the investigative stop "must have personally assessed the reliability of the informant's tip before making the stop." *Pratt*, 286 Mont. at 166, 951 P.2d at 43. After analyzing both United States Supreme Court and Ninth Circuit Court of Appeals jurisprudence on the issue, we determined that the officer could reasonably rely on

7

information conveyed by a dispatcher or other officer for particularized suspicion justifying an investigatory stop without being required to personally assess the underlying reliability of the information. *Pratt*, 286 Mont. at 166-67, 951 P.2d at 43-44.

¶17 We recently reaffirmed that, in applying the three-factor *Pratt* analysis to the totality of the circumstances, "when a tip has been relayed from dispatch and an officer has acted on that information, it is appropriate to look beyond the stopping or investigating officer to include the information known to the dispatching or reporting officer." *State v. Hall*, 2004 MT 106, ¶ 15, 321 Mont. 78, ¶ 15, 88 P.3d 1273, ¶ 15.

¶18 In the present case, the audio tape of Yunis' 911 call clearly establishes that she gave the original 911 dispatcher her first name, correct cell phone number, description of the vehicle she was driving and the name of the town in which she lived. This information identified Yunis sufficiently to expose her to criminal or civil liability if her information was false. These facts, when considered under the first *Pratt* factor, lend a high indicia of reliability to Yunis' report.

¶19 The second *Pratt* factor relating to indicia of reliability requires consideration of whether Yunis' citizen's report contained sufficient detail to establish that her information was based on her personal observations. *Pratt*, 286 Mont. at 165, 951 P.2d at 42. Myhre again argues that, because the highway patrol's call for service report contained no information indicating--and Reddick himself did not know--whether Yunis was relaying personal observations regarding the incident, there was insufficient indicia of reliability in the report to support the existence of a particularized suspicion. He contends, specifically,

8

that it would be "reasonable to conclude that if the citizen informant actually observed such actions that she would have been able to provide a make, model and year of the vehicle, as well as the complete plate number." This contention, too, is without merit.

¶20    Here, the audio tape of Yunis' call to 911 establishes that the information she conveyed was based on her personal observations. Much of that detailed information is set forth in ¶ 3 above and need not be repeated here. Yunis continued to talk on her cell phone to the dispatcher for a number of minutes, giving a "play-by-play" report including that the truck was being driven all over the road; its lights kept going on and off; the truck had gone off the road into the ditch and then back onto the road; and that the truck exited the highway at the Manhattan, Montana, exit only to re-enter the highway and pass her vehicle again. Additionally, Yunis was able to inform the dispatcher--while talking and driving on a dark evening--that the truck was white in color and the license plate number began with the number 21. Yunis' citizen's report contained sufficient detail with regard to both quality and quantity to establish that her information was based on her personal observations of the incident. These facts, when considered under the second *Pratt* factor, also lend a high indicia of reliability to Yunis' report.

¶21    The third *Pratt* factor is whether the officer's personal observations corroborate the information given in the citizen informant's report. *Pratt*, 286 Mont. at 165, 951 P.2d at 43. Myhre contends that corroboration of a citizen tip "occurs when the officer personally observes illegal activity to justify an investigative stop," and notes that this did not occur in this case because Reddick did not personally observe any activity, such as erratic driving or

9

a traffic law violation, which would corroborate Yunis' report of a possible intoxicated driver. However, under *Pratt*, a citizen informant's tip also may be corroborated "when the officer . . . finds the person, the vehicle, and the vehicle's location substantially as described by the informant." *Pratt*, 286 Mont. at 165, 951 P.2d at 43.

¶22 As stated above, Yunis was on her cell phone with the 911 dispatcher for several minutes reporting her observations of Myhre's truck. The 911 dispatcher relayed this information to the highway patrol dispatcher, who then relayed the information to Reddick. Reddick testified at the hearing in the District Court that the highway patrol dispatcher informed him of the description of the reported vehicle and that the report referenced a location at mile marker number 286. The dispatcher also advised Reddick that the citizen informant had observed the truck drive off the highway into the ditch at one point. Reddick observed two vehicles parked on the side of the highway at mile marker number 274. He pulled in behind the first vehicle, which was a white truck with license plates beginning with 21. At that point, Reddick also saw a clump of grass stuck in the truck's rear bumper, which Reddick connected to the report that the truck had driven into the ditch.

¶23 Myhre asserts that the vague description of the vehicle and the twelve mile difference in location where Reddick encountered the vehicle rendered the corroboration insufficient. We conclude, however, that twelve miles down the highway is a location "substantially as described by the informant" when the vehicles at issue are traveling at the posted speed of 75 miles per hour or more. Moreover, the vehicle Reddick observed shortly after receiving the dispatch matched the description given in the citizen report. We conclude that Reddick's

10

observations sufficiently corroborated Yunis' citizen report as required in the third *Pratt* factor.

¶24    Based on the totality of the circumstances presented in this case, we conclude that the information provided by Yunis contained sufficient content and indicia of reliability to support a particularized suspicion on Reddick's part justifying the investigative stop of Myhre's truck.  As a result, we hold that the District Court did not err in determining that Reddick had particularized suspicion to stop Myhre's truck and in denying Myhre's motion to dismiss on that basis.

¶25    Affirmed.


/S/ KARLA M. GRAY

We concur:

/S/ JOHN WARNER
/S/ PATRICIA O. COTTER
/S/ JIM RICE
/S/ BRIAN MORRIS

11